# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 6, 2013

## STATE OF TENNESSEE v. KEITH BATES

**Appeal from the Criminal Court for Shelby County**
**No. 11-00147      Lee V. Coffee, Judge**

---

**No. W2012-02338-CCA-R3-CD  - Filed November 27, 2013**

---

A jury convicted the defendant, Keith Bates, of aggravated robbery, a Class B felony, and he was sentenced to twelve years' imprisonment. The defendant testified that he had been in jail around the time of the crime, and the State then questioned him about the timing of his imprisonment and release. On appeal, the defendant challenges the sufficiency of the evidence and the trial court's decision to allow the State to question him about the timing of his release from jail. After a thorough review of the record, we conclude there was no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Edwin Lenow, Memphis, Tennessee, for the appellant, Keith Bates.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kate Edmands, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The aggravated robbery at issue was the carjacking of the victim, Derrick Key, a crime which occurred in the mid-afternoon of September 27, 2010, at a grocery store and was in

part captured on video. Officer Charles Wren of the Memphis Police Department testified that at around 2:00 p.m. on September 27, 2010, he was standing in front of a house taking a report regarding an unrelated incident when the victim walked up in his underwear. At the same time, he received a dispatch regarding a carjacking that had just occurred at the Y&F Market, four blocks away. He ascertained that the victim was seeking help for the same incident mentioned by the dispatch, and he created an incident report.

The victim testified that he was currently employed driving a forklift for a company called Western Power Sports and had been there for five years. His supervisor was Dave and his head supervisor was Mike Vincent. The victim was acquainted with the defendant's older brother and was familiar with the defendant, who was four or five years younger than him, from seeing him around the neighborhood and from the South Side Boys' Club which they both used to frequent. He knew the defendant by the nickname "Ke-Ke."[1]

On September 27, 2010, between 2:00 and 3:00p.m., the victim drove to the Y&F grocery store, which was less than a block from his house, in his 2000 black Tahoe, which was outfitted with custom rims that had cost $6,400. The victim went into the store to pay his electric bill using cash but returned to the car to get some change for a "Black & Mild." As the victim was approaching his car, the defendant called the victim's name. The victim turned to see the defendant "patting" a gun, and the defendant said, "You already know what this is." The victim testified he put his hands up and told the defendant he could "have it" and that the defendant didn't need to point a gun at him. The defendant said, "Give me your pants." The victim, who had an artificial hip, leaned on a car, removed his shoes to get his pants off, and left his shoes at the scene of the robbery. The defendant then asked where the keys were. The victim told him he had dropped the keys and that they were under the truck. He kept asking the defendant, who was five to six feet away, not to point the gun at him. The gun was pointed above the victim's chest. The defendant instructed the victim to "Break bad," which the victim testified meant to run away.

The victim ran. The victim had been standing by the driver's side door, and he heard a loud noise, which he believed was a gunshot but which may have been a car backfiring, when he had taken about three steps and was behind the truck's tailgate. The victim testified that the robbery occurred around 3:00 p.m. and that both the Y&F store and a liquor store across the street were busy. He asked a customer to use a phone, but the customer did not let him. The victim ran toward his house and saw the defendant drive away. The victim used his neighbor's cell phone to call police. He then went towards a street the defendant frequented, hoping to see the defendant and be able to direct police to his vehicle. Instead,

[1]The transcript spells the defendant's nickname "Kiki," but the victim's handwritten identification in the photographic line-up spells the nickname "Ke-Ke."

-2-

he saw Officer Wren and told him about the robbery. The next day, the victim found his car in front of his house. He identified the defendant from a photographic lineup.

The State then introduced the video recording capturing the robbery. Stills from the videotape show a man the victim identified as the defendant pointing a gun at the victim. The victim testified that the defendant had a very pink lower lip, which could be seen in the photographic lineup and in the video.

On cross-examination, the defense pointed out inconsistencies between the victim's statement to police and his testimony. The victim acknowledged that he had told police that he had been robbed by two men whose nicknames were Ke-Ke and Killer Key. He testified that he had gone back to the store with police and had viewed the video of the robbery. The victim testified that his statement was incorrect when it indicated that, while viewing the video at the store, he saw Killer Key pick up the clothes and keys and run off. The victim testified that Killer Key had actually handed the keys to the defendant before running away. He acknowledged that his statement did not indicate that the defendant had driven off in the vehicle. He testified that he told police that Killer Key was Marquis[2] Watts but this fact was not included in the statement. The victim clarified that after calling police on his neighbor's phone, he had gotten into his extra car at home and was driving around looking for the defendant when he saw the police officer and decided to tell him about the incident. The victim denied having had any dealings with the defendant in the past or telling the defendant he would get him in trouble. On redirect examination, the victim confirmed that he had seen the defendant driving his car and that he had actually handed his pants to the defendant.

Officer Demar Wells, a crime scene investigator, testified that he processed the victim's car after it had been returned. He pulled seventeen latent fingerprints off of the vehicle, but none were a match for the defendant's prints. He testified that it was not unusual for a suspect's prints to be absent from a vehicle used in a crime.

Officer Robert Winston, a latent print examiner, testified that another officer, currently on sick leave, had examined the seventeen fingerprints collected from the victim's vehicle. Only two of the cards had enough detail that they could be compared to the defendant's fingerprints: one print from the rear driver's side door window and one from the gas cap. Neither matched the defendant's fingerprints.

The defense then called the victim's credibility into question by introducing evidence

---

[2]According to the transcript, the victim gave the name "Maurice" Watts. However, Mr. Watts was called to the stand outside the presence of the jury, at which time he refused to testify and gave his name as "Marquis."

that he had not been honest about his employment during his testimony. Michael Vincent, the warehouse manager at Western Power Sports, testified that the victim was not, in fact, currently employed by the company and had not been an employee since April 1, 2009, when he had quit the job. Mr. Vincent testified that the victim had been a good employee and had always been honest.

The defendant then testified in his own behalf. He acknowledged having pled guilty to theft of property over $1,000, to burglarizing a motor vehicle, and to theft under $500 in 2007, and he also acknowledged having pled guilty to another theft of property over $1,000 in 2008. He testified that he did not know the victim and was not at the Y&F store on September 27, 2010. According to the defendant, he was at his sister's house during that time. He testified that he did not know Mr. Watts or anyone who went by the name Killer Key. The defendant acknowledged that his nickname was Ke-Ke but stated that he had never gone to the South Side Boys' Club. The defendant testified that he did not live in the victim's neighborhood but in an area about thirty to forty minutes from the South Side Boys' Club and that there were two Boys' Clubs closer to his home. He testified that he did not commit the robbery and knew nothing about it other than what he had heard in court.

On cross-examination, the defendant identified a house that his aunt lived in on Carnegie Street, which was about one block from the Y&F grocery store. He stated he did not know where the victim lived. He testified that the object the robber held in the video may have been a drink or a gun or a knife. The defendant denied that he was frequently at his aunt's house, describing her as a "story aunt" who had plastic on her couch and who thought she worked hard for her possessions.

The defendant testified that he was a slow learner and received disability. He stated he did not know his sister's address or her street. The defendant asserted that at the time of the crime, he was staying partially with his mother but was "over at" his sister's house, too. He then explained that he had stayed at his sister's on September 26, 2010, because she had been off work and his cousin and other friends were coming over. In response to the State's question inquiring how long he had been staying with his sister, the defendant volunteered, "I just got released from jail so that was like – I think it was a couple of weeks or like a month-and-a-half when I got released from jail."

The prosecution then delved into the defendant's imprisonment, asking – without objection from the defense – how long he was in jail, to which the defendant responded, "It wasn't nothing but forty-five days." The prosecution asked how many days the defendant had been out of jail at the time of the robbery, and the defense objected based on relevance. The trial court allowed the question because it was relevant to the defendant's previous testimony that he was staying with his sister. The defendant testified he had been out of jail

for two months.

The defendant asserted that he had spent the day of September 27, 2010, with his sister, his cousin Kimberly, and his girlfriend Ashley. He testified that around September 30 and October 1, 2010, he and his father drove to Missouri, where his father worked, and that he stayed there until he was taken into custody on the robbery charges in March 2011. He testified he went to Missouri because he usually spends every other summer there, because he would go there every other month, and because there was a death in his family.

The jury convicted the defendant of aggravated robbery. Despite the defendant's prior convictions, the State did not file a notice regarding sentencing range, and the trial court sentenced the defendant as a Range I offender to the maximum of twelve years within the range.

The defendant raised several issues in the motion for a new trial, including that the evidence was insufficient to support the verdict and that the trial court committed reversible error in allowing the State to ask the defendant how long he had been out of jail. The trial court concluded that the testimony was admitted because the defendant had given an unresponsive answer and that the prosecution had not asked him when he had been incarcerated but had only asked him where he was on certain dates. The trial court further found that the strength of the case was "absolutely overwhelming" and that the defendant could not claim error when he introduced the unsolicited testimony. The court also concluded the evidence was sufficient to support the verdict. The defendant appeals.

**ANALYSIS**

**I. Sufficiency of the Evidence**

On appeal, a court examining the sufficiency of the evidence must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). If the appellate court determines that the evidence was not sufficient to support the verdict, the verdict must be set aside. Tenn. R. App. P. 13(e). On appeal, the presumption of innocence is replaced by a presumption of guilt. *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003). Accordingly, the State is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which may be drawn from the evidence. *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). "The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." *State v. Echols*, 382 S.W.3d 266, 282 (Tenn. 2012). The appellate court may not reweigh or

reevaluate the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). The burden of showing that the evidence is insufficient to support the verdict falls on the defendant. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010).

The defendant was convicted of aggravated robbery, which is the intentional or knowing theft of property from the person of another by violence or putting the person in fear when it is accomplished with a deadly weapon or display of an article fashioned to lead the victim to reasonably believe it is a deadly weapon. T.C.A. §§ 39-13-401, -402 (2010). The victim testified that the defendant approached him with a gun and demanded his pants and car keys while pointing the gun at him. He testified he was afraid the defendant would shoot and kill him. He then saw the defendant drive away in the car. The robbery of the victim was captured on video. Stills from the robbery clearly show the perpetrator pointing a gun at the victim. The victim testified that he was familiar with the defendant, knew the defendant's family, had seen him many times around the neighborhood and at other places they both frequented, and knew his name. The victim testified that, aside from his acquaintance with the defendant, he was able to identify the defendant by a unique physical characteristic, a pink discoloration of the defendant's lip. He also identified a point in the video when this characteristic was noticeable. The victim's car was returned to his home, although the robbery had not taken place there. The defendant emphasizes that his fingerprints were not found in the vehicle. The defendant furthermore testified that he did not know the victim at all and that he did not go to the Boys' Club or the victim's neighborhood, and that the person committing the robbery in the video (not him) was not even necessarily armed with a gun. However, the question of the identity of the person robbing the victim, and whether it was at gunpoint, was a factual determination for the jury to make. The trial court described the evidence as "absolutely overwhelming," and we agree that a rational trier of fact could have found beyond a reasonable doubt that the defendant took the victim's property by violence or putting him in fear and that the defendant used a deadly weapon or an article fashioned to lead the victim to reasonably believe it was a deadly weapon.

## II. Testimony Regarding the Defendant's Release from Jail

The defendant next objects that the trial court erred in allowing the State to question him regarding how long he had been out of jail at the time of the crime. The State responds that the defendant's own testimony opened the door to the State's questioning and that any error was harmless.

A trial court's rulings regarding the admissibility of evidence, including the admissibility of prior convictions, and its rulings regarding the propriety and form of

cross-examination are reviewed for abuse of discretion. *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997); *see also State v. Reid*, 213 S.W.3d 792, 840 (Tenn. 2006); *State v. Hill*, 333 S.W.3d 106, 128 (Tenn. Crim. App. 2010). Likewise, a trial court's rulings on relevance are reviewed for abuse of discretion. *State v. Sexton*, 368 S.W.3d 371, 410 (Tenn. 2012).

The admissibility of prior convictions is governed by Tennessee Rule of Evidence 609, which allows a criminal defendant's prior convictions to be introduced when the crime is either a crime of dishonesty or false statement or a crime punishable by death or imprisonment in excess of one year, and after the court, upon request, has determined that the probative value on credibility outweighs unfair prejudicial effect on substantive issues. Tenn. R. Evid. 609(a)(2)-(3).[3] Tennessee Rule of Evidence 404(b) governs "other crimes, wrongs, or acts," which may not be admitted to show conformity with a character trait, but may be admissible for some other purposes. Like Rule 609, Rule 404 requires an evaluation of whether the evidence's probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(4).

It is helpful here to clarify what the defendant is not asserting. The defendant does not challenge the admission of his own, unsolicited testimony that he had recently been convicted of a crime and released from jail. Accordingly, Rule 609 is not implicated. Neither does his challenge appear to involve "other crimes, wrongs, or acts." Instead, the evidence to which he objects clarifies the circumstances of the unchallenged testimony regarding his prior imprisonment and release. Accordingly, it is governed by the basic rules of relevancy and is admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable and if its probative value is not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 401, 403. The trial court ruled that the testimony was relevant to the determination of the defendant's identity as the robber because the State was entitled to elicit testimony regarding the defendant's whereabouts and residence at the time of the crime.

Evidence that is not admissible based on relevance may nevertheless be admitted if the defendant "opens the door" by putting it into controversy. A "notoriously imprecise" doctrine, "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). Raising a subject at trial which would otherwise be inadmissible brings it into the sphere of relevance and allows the opposing party to likewise introduce evidence on the subject. *Id.* (citing 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039 (2d ed. 1987)). Thus, opening the door is "really a rule of

---

[3]The trial court conducted a hearing and determined that some of the defendant's prior convictions, not at issue here, were admissible under Rule 609.

expanded relevancy." *Id.* (quoting *Clark v. State*, 629 A.2d 1239, 1242 (Md. 1993)).

The doctrine also reflects the policy that a party may not take advantage of errors that the party committed, invited, or induced. Neil P. Cohen et al., 1-1 *Tennessee Law of Evidence* § 1.03[3][d] (6th ed. 2012, LexisNexis); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The evidence introduced by the opposing party in response to an "opened door," however, must be on the same subject and not merely a related one. *Gomez*, 367 S.W.3d at 247 (concluding that testimony that the co-defendant would not hurt the child victim did not open the door for evidence regarding the co-defendant's violent history against the defendant); *State v. Riels*, 216 S.W.3d 737, 747 (Tenn. 2007) (holding that the defendant's statement during the sentencing hearing that he did not want to hurt anybody was an expression of remorse and not a denial of guilt and that therefore it did not open door to cross-examination about the circumstances of the crime).

If a trial court errs in concluding that the door to otherwise inadmissible evidence has been opened, reversal is not necessarily required; instead, the reviewing court conducts harmless error analysis. *Gomez*, 367 S.W.3d at 249. Like any error in admitting evidence, admitting evidence under the "open door" doctrine is non-constitutional error which is reversed if, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *Gomez*, 367 S.W.3d at 249 (quoting Tenn. R. App. P. 36(b)). The reviewing court should consider the strength of the evidence establishing the defendant's guilt. *Gomez*, 367 S.W.3d at 249.

Here, the defendant's unsolicited testimony was not merely that he had recently been in jail at the time of the robbery. The defendant volunteered, "I think it was a couple of weeks or like a month-and-a-half when I got released from jail." Accordingly, the defendant had already put into evidence unsolicited testimony regarding *how long* he had been out of jail when the robbery occurred. The State's subsequent questions regarding how long he had been out of jail were merely to clarify the testimony the defendant had already introduced. The State did not, in fact, introduce *new* inadmissible evidence, but merely asked the defendant to reiterate the evidence he had previously volunteered. When the trial court ruled the testimony admissible, the defendant stated that he had been out of jail for two months. Because the State was merely clarifying the defendant's own non-responsive testimony, the trial court did not abuse its discretion in allowing the question. *See State v. Wyrick*, No. 1321, 1991 WL 87246, at *4 (Tenn. Crim. App. May 28, 1991) ("Obviously, the defendant's testimony . . . means that he cannot complain about the state's recitation of such fact during cross-examination. In this regard, the state's initial question . . . was a legitimate clarification of the defendant's statement . . . ."). Furthermore, in light of the strength of the State's case,

which the trial court characterized as "absolutely overwhelming," and in light of properly admitted evidence of the defendant's prior burglary and thefts, as well as his volunteered testimony regarding his forty-five day sentence, even if the admission had been in error, such error would have been harmless.

## CONCLUSION

Because the evidence was sufficient to support the verdict and because the trial court did not abuse its discretion in permitting the State to clarify the defendant's testimony regarding how long he had been out of jail, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE