IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 20, 2014

**STATE OF TENNESSEE v. LARRY LEE SMITH**

**Appeal from the Criminal Court for Knox County**
**No. 98676     Bobby R. McGee, Judge**

_____

**No. E2013-01162-CCA-R3-CD - Filed November 24, 2014**

_____

A Knox County Criminal Court jury found the Defendant, Larry Lee Smith, guilty of aggravated rape, a Class A felony, and two counts of aggravated kidnapping, Class B felonies.  See T.C.A. §§ 39-13-502, -304.  The trial court merged the two counts of aggravated kidnapping and sentenced the Defendant to an effective sentence of life without parole.  On appeal, the Defendant argues that: (1) the trial court erred in allowing the State to introduce evidence of his prior felony convictions; and (2) the trial court erred in the manner in which it allowed the State to present proof of his prior convictions.  Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and DAVID A. PATTERSON, SP. J., joined.

Patrick T. Phillips (on appeal) and Mitchell Harper (at trial), Knoxville, Tennessee, for the Defendant-Appellant, Larry Lee Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah and John H. Bledsoe, Assistant Attorneys General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On January 17, 2012, the Knox County Grand Jury returned a three-count indictment charging the Defendant, Larry Lee Smith, with aggravated rape and two alternative counts

of aggravated kidnapping of S.J.[1]  The proof presented at trial was largely undisputed.

**State's Proof.**  The twenty-year-old victim testified that she was from Atlanta, Georgia and that she currently lived in Georgia.  When she was sixteen, the victim left school and moved to Knoxville with her boyfriend.  The couple did not have stable housing and they lived at Christy Harris's apartment at Volunteer Studios in October 2011.  On October 24, 2011, the victim returned to the apartments from the library and learned from the Defendant and Christy that her boyfriend had been arrested.  The victim immediately began to cry, and Christy left to retrieve a cell phone for the victim to use.

While waiting for Christy to return, the victim sat in a green chair in the Defendant's one-room studio apartment.  As she continued to cry, the Defendant attempted to console her. The victim accepted his offer of tea and cigarettes, but she did not want any food.  The Defendant asked the victim if they could switch places so that he could sit in the chair and eat.  The victim agreed and moved to the edge of the bed.  The Defendant then proceeded to make peas and onions for himself and ate at the table.  After eating, the Defendant turned on a movie and asked the victim to help him with something at the side of the bed.  As the victim reached over to the edge, the Defendant placed a necktie around her wrist.  When she pulled her hand away, the binding became tighter.

The victim testified that the Defendant told her to calm down, and he immediately dropped his pants.  He then crawled between her legs and held them down with his body weight.  The Defendant removed her leggings and told the victim he would kill her if she did not cooperate.  He tried unsuccessfully to bind her left hand with another necktie.  He placed his forearm on the victim's neck and she became light-headed and "could barely breathe[.]" The Defendant told the victim that he would "break [her] f***ing legs" if she kept her legs squeezed together.  The victim testified that the Defendant's "face was red, his eyes were watery, he was sweaty, very sweaty, his sweat was dripping on [her]."  She said that the Defendant made her feel "really nasty" and that he used three fingers to penetrate her vagina. She stated that he also hit her at one point.

The Defendant stopped the assault when someone knocked at his door.  He "jumped off" of the victim to see who was at the door.  He then stated, "[N]obody's here, come back later."  The victim yelled, "somebody's here," but she did not cry out for help because she thought that the Defendant would kill her.  She immediately untied herself and began putting on her clothes.  The Defendant then moved the green chair in front of the door, sat down, and said that she was not going anywhere.  The victim told him that she would jump off the

---

[1] We refer to victims of sexual offenses by their initials only.

balcony. As she walked toward the door, the Defendant handed her a knife, which she took and placed on the table. The victim assumed that he wanted her to stab him, but she just wanted to leave. She was able to walk through the front door, but the Defendant asked her not to say anything.

The victim then used a resident's phone to call her boyfriend's sister, who told her to go to the front office and call the police. After the police arrived, the victim met with someone from the sexual assault crisis center. She did not go to the hospital because her mother said that she could see a nurse or doctor upon returning to Georgia. However, the victim did not seek treatment in Georgia. After the assault, she had some difficulty swallowing and limped for a few days. The victim also had vaginal discharge for a week. She identified various photographs of the Defendant's apartment from the day in question.

On cross-examination, the victim denied that she and the Defendant had discussed selling his prescription medication to raise $500 to help the victim and her boyfriend. She said that she was crying about the arrest and did not think about anything else.

Kathy Brown testified that she was the manager at Volunteer Studios in Knoxville and that the Defendant was a tenant in 2011. She said that on October 24, 2011, the Defendant came down to the front desk "a couple of times" and that he appeared red-faced and sweaty. She stated that the victim, who was "visibly upset," later came down to the front desk and reported being raped by the Defendant in his apartment. Ms. Brown then brought the victim to her office, and they called the police. A recording of the 911 call was played for the jury without objection. Ms. Brown was uncomfortable with the situation and asked another employee, Scott Brown, to come down to the front desk. She then stayed in her office with the victim until the police arrived.

Scott Brown testified that on October 24, 2011, his manager called for him to come to the office where he observed the victim "crying hysterically[.]" He remained at the front desk because Ms. Brown was worried. While he was waiting for the police, the Defendant returned to the front desk appearing "beet red" and "out of breath[.]" The Defendant asked to speak with the manager, and Mr. Brown told him that the best thing to do was to wait for the police. Mr. Brown then accompanied the Defendant when he went outside to smoke a cigarette. The Defendant "was saying how [the victim] wanted him to and stuff," and Mr. Brown told him that he was not taking sides. He stayed with the Defendant until the police arrived. He acknowledged on cross-examination that the Defendant did not try to leave after learning that the police had been called.

Investigator Patricia Tipton of the Knoxville Police Department testified that she was the lead investigator in the Defendant's case. She interviewed the Defendant at the police

station after the assault. Investigator Tipton said that the Defendant was calm and did not want to speak at first but then changed his mind. He consented to DNA swabbing of his hands and advised Investigator Tipton that the victim's DNA would be present because he had touched her. The Defendant also consented to a search of his apartment. After Investigator Tipton advised the Defendant that the victim reported being tied down, the Defendant asked Investigator Tipton for his cell phone so that he could show her images of consenting women bound in neckties. The Defendant told Investigator Tipton that the victim had been staying with Christy Harris and that he had previously paid Christy to be bound with ties. After receiving the phone, Investigator Tipton wrote and executed a search warrant to obtain the photos that she saw. However, the Defendant had deleted the bondage images while the phone was still in his possession.

A redacted video recording of the interview was played for the jury. At the start of the recording, the Defendant told Investigator Tipton, "Whatever she says happened happened." During the DNA swabbing, Investigator Tipton advised the Defendant that she was looking for the victim's vaginal secretions on his hands. The Defendant responded, "Her DNA will be on my hands because I have touched her." The Defendant later told Investigator Tipton that he was being set up. He subsequently stated, "I guess the comment I made about being able to take care of her better than a crack dealer really really set her off." According to Investigator Tipton, the Defendant "couldn't decide which version of events he wanted to go with."

Investigator Tipton also interviewed the victim on the day of the assault. She said that the victim was "[u]pset" and "shaken" at first but was "exceptionally articulate" during the interview. After searching the Defendant's apartment, Investigator Tipton found many facts that corroborated what the victim had reported. She also verified that the victim's boyfriend had been arrested that day.

**Defense's Proof.** The fifty-two-year-old Defendant testified on his own behalf. He said that he moved to Volunteer Studios in May 2011 after sustaining an injury in a car accident. He met the victim and her boyfriend when they were staying with Christy Harris, who lived downstairs. On the morning of October 24, 2011, the Defendant went to court to testify against a man who had robbed him. The Defendant believed that this man may have set him up.

Shortly after the Defendant returned to his apartment at around noon, Christy arrived and told him that the victim's boyfriend had just been arrested. About ten minutes later, the victim knocked on his door. The Defendant considered the victim to be a friend so he comforted her as she cried about her boyfriend's arrest. He testified that Christy then left to use a phone because she "was looking for an excuse to leave." He said that Christy did not

-4-

want the victim to leave with her because Christy wanted to sell an electronic device that belonged to the victim's boyfriend.

The Defendant told the victim that he was sorry about her boyfriend's arrest. He felt somewhat responsible because he had kicked a man named David out of his apartment the night before. David then stole quarters from the laundry room and went to Christy's apartment. The next day, the police were called, and David and the victim's boyfriend were arrested. The Defendant said that he must have made the victim mad, and "[t]hat started it[.]" He then prepared some tea and peas because it was lunchtime. He switched places with the victim and sat down in the chair to eat. The victim made herself comfortable on the bed because she "felt at home in [his] apartment." They discussed ways of earning money because neither of them had any. The victim began to cry again when they talked about her boyfriend. The Defendant "walked over and held her" and told her not to cry. He "talked bad" about how the victim's boyfriend never bought her any clothes. The Defendant testified that he "made a mistake" with these negative comments and that the victim was angered as a result.

The Defendant testified that the victim asked him for $500, but the Defendant did not have any money. He said that he rejected the victim's plan to earn money from selling his prescription painkillers. The victim then began to cry again and told the Defendant that she was leaving. After the victim left, the Defendant felt that he "need[ed] to go talk to somebody." He put on his shirt and shoes and went downstairs to talk to the manager, Kathy Brown. He said that another resident told him that the victim and the manager were calling the police on him. The Defendant then went downstairs because he had done nothing wrong. He smoked some cigarettes outside and waited for the police to arrive. He denied telling Scott Brown that the victim "wanted it[.]" He explained that when he told Investigator Tipton that he had touched the victim, he meant that he had tried to comfort her.

On cross-examination, the Defendant said that the victim was "vengeful," and he denied digitally penetrating her vagina. He acknowledged showing Investigator Tipton photos of Christy tied to the bed with neckties. He explained that the victim was always around Christy and would have known to mention the neckties to the police. He said that the victim was "real mad" at him because he tried to make her feel better by "talking bad" about her boyfriend. The last thing the Defendant said to the victim was, "I hope he does more time." The Defendant agreed that he was sweating when he went to the front desk. He did not know what happened to the photographs on his phone and said that he could have accidentally deleted them. He acknowledged that he had a prior felony conviction in Florida and another in Georgia. The Defendant conceded that he had provided various reasons for why the victim would accuse him of rape. He insisted that the victim was "looking for revenge."

-5-

Based on the above proof, the jury convicted the Defendant as charged of aggravated rape and two counts of aggravated kidnapping based on alternative theories. The trial court subsequently merged the two counts of aggravated kidnapping and sentenced the Defendant as a repeat violent offender to life imprisonment without parole for the aggravated rape conviction. For the aggravated kidnapping conviction, he was sentenced as a Range II, multiple offender to twelve years at 100 percent release eligibility, to be served concurrently with the life sentence. This appeal followed.

## ANALYSIS

I. **Admission of Prior Convictions.** On appeal, the Defendant argues that the trial court denied him a fair trial when it erroneously ruled that he had "opened the door" to cross-examination regarding his prior convictions from Florida and Georgia. The State responds that the trial court properly admitted proof of the Defendant's prior felony record. Upon review, we conclude that the Defendant is not entitled to relief.

Prior to trial, the State filed a notice of its intent to seek enhanced punishment and to impeach the Defendant with two prior felony convictions pursuant to Rule 609 of the Tennessee Rules of Evidence. According to the notice, the Defendant was convicted in Florida in 1982 of involuntary sexual battery and received a five-year sentence. He was also convicted in Georgia in 1990 of kidnapping and was sentenced to twenty years.[2]

During his direct testimony, the Defendant said that the victim asked him to participate in a prescription drug scheme to earn $500. The Defendant testified that he responded to the victim as follows:

> And I said, no, no, no, no, you're not going to get me like that. You're not going to get me like that. . . . But, no, I'm not giving you up my pills, no. I said, I can't afford no problems. The first felony, you know, will put me in jail. I'm not going to jail, no, thank you.

Before its cross-examination of the Defendant, the State requested a jury-out hearing. The State argued that the Defendant had "opened the door" to inquiry regarding his prior felony record. The State noted that the Defendant's 1982 conviction for involuntary sexual battery in Florida was "actually the same as [Tennessee's] rape statute[.]" The State also explained that the Defendant had been released on parole in 2009 for his kidnapping conviction from Georgia. In recognizing the similar nature of the prior convictions with the

---

[2] It is unclear from the appellate record whether the trial court ever issued a Rule 609 ruling on these prior convictions.

charges at trial, the State sought only to impeach the Defendant regarding the existence of the prior felonies but not the nature of the conduct.

Defense counsel objected, arguing that the Defendant did not deny the existence of a prior record, but merely stated that he did not want to engage in felony activity. Defense counsel further asserted that the prior convictions were highly prejudicial and similar in nature to the charges at trial.

Before taking a recess to review the trial transcript, the trial court stated that the kidnapping conviction from Georgia was "within the ten year rule."[3] The trial court noted that if the Defendant had indeed said, "first felony," it would allow the State to introduce both prior felonies, including the 1982 conviction from Florida. However, the court would not allow the State to refer to the nature of the convictions.

After reviewing the transcript of the Defendant's testimony, the trial court made the following ruling:

> [N]ow, I understand that you could argue about what he really meant by that, but given the fact that he has in fact made a reference to a felony conviction being his first felony the Court's going to have to rule that he has opened the door, and I will allow the State to introduce evidence that he has been convicted of felonies twice in the past, once in Georgia and I think once in Florida.

When the matter was revisited at the motion for new trial hearing, the trial court held, in pertinent part:

> The defendant's testimony was convoluted. He was not a very good witness. He tried to slough it all off and also denied doing it. And also paint himself as a harmless sort of guy who just wouldn't do that, and who didn't have a -- he just couldn't put up with having the first felony on his record.

> So the Court's holding is the evidence is sufficient, and that the defendant did open the door by stating that he couldn't have that first felony. And the State did have a right to impeach him by introducing the fact of his prior felony convictions, not the nature of the offense, but simply the fact of the conviction.

---

[3] See Tenn. R. Evid. 609(b) (generally, convictions that are ten years old or more cannot be used for purposes of impeachment).

The Defendant contends on appeal that the trial court erred in its ruling. The Defendant claims that his testimony, "The first felony, you know, will put me in jail. I'm not going to jail, no, thank you," was not a denial of his prior felony record, but rather, was "merely a statement that a felony would put [him] in jail." He asserts that the testimony was "literally true and not subject to impeachment." He maintains that "first" is a figure of speech synonymous with "next" and that a new trial is warranted because of the trial court's error.

Initially, we note that the trial court did not admit the Defendant's two prior convictions pursuant to Rule 609. Rather, the trial court ruled that the State could cross-examine the Defendant because he had "opened the door" regarding his prior felony record. "Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). "Even if evidence is inadmissible, a party may 'open the door' to admission of that evidence." State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012). A party commonly opens the door "by raising the subject of that evidence at trial." Id. Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1 (2d ed.1987)). In other words, "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." Id. After a witness has "opened the door," however, an opposing party should introduce evidence on the same subject matter or risk reversible error. See State v. Riels, 216 S.W.3d 737, 746 (Tenn. 2007) (trial court erred in ruling that defendant opened the door to unlimited cross-examination concerning details of the crime after defendant expressed remorse to the victims' families); Gomez, 367 S.W.3d at 247 (trial court erred in ruling that co-defendant's testimony that defendant would not hurt minor victim opened the door to evidence regarding defendant's prior assaults against co-defendant).

In State v. Kendricks, 947 S.W.2d 875 (Tenn. Crim. App. 1996), this court held that "'[i]rrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who "opens the door" and testifies on direct examination that he or she has never been convicted of a crime, or to counter some other facet of direct testimony.'" Id. at 883 (quoting Cohen, Sheppeard & Paine, Tennessee Law of Evidence § 609.1 (3d ed. 1995). Here, as in Kendricks, "the State was impeaching the defendant's testimony on direct as being less than forthright." Id. See also State v. Brian Jermaine Dodson, No. M2011-00523-CCA-R3-CD, 2012 WL 2403624 , at *15-17 (Tenn. Crim. App. June 27, 2012) (holding that the trial court properly allowed defendant to be

impeached with prior assault convictions after the defendant testified, "I'm not that type of person"), perm. app. denied (Tenn. Oct. 17, 2012). We agree with the trial court that the State was entitled to impeach the Defendant's testimony that he could not afford any problems because the first felony would put him in jail. By testifying in this manner and stating that he had rejected the victim's solicitation to participate in criminal activity, the Defendant placed his prior criminal record in controversy and increased the probative value of his felony convictions. See, e.g., State v. Jeffrey L. Vaughn, No. W2012-01987-CCA-R3-CD, 2013 WL 1282331, at *9 (Tenn. Crim. App. March 28, 2013) (probative value of defendant's 1990 conviction for drug dealing increased appreciably after defendant testified under oath that he did not sell drugs), perm. app. denied (Tenn. Sept. 25, 2013). On cross-examination, the State briefly questioned the Defendant about the existence of his two prior felonies and did not address the nature of the offenses, thereby limiting any prejudicial effect. See Tenn. R. Evid. 403. The State's questioning was certainly within the "realm of relevance" of the issue that the Defendant raised on direct examination. Gomez, 367 S.W.3d at 246. We conclude that the trial court did not err in its evidentiary ruling.

**II. Manner of Introduction of Prior Convictions.** In a related issue, the Defendant argues that even if he opened the door to cross-examination regarding his prior felonies, "the manner in which the existence of a prior felony was put before the jury[] was unduly prejudicial." He argues that the trial court erred in permitting the State to cross-examine him regarding both the Florida and the Georgia convictions and that "the leeway given the [S]tate was double that which was necessary" and "the effect was twice as prejudicial." The Defendant maintains that the trial court should have employed the least prejudicial alternative, specifically by offering him the opportunity to stipulate that he had a prior felony conviction. Finally, the Defendant argues that the trial court should have weighed the probative value of his convictions against the prejudicial effect of the evidence.

The State responds that the trial court properly exercised its discretion in limiting the scope of the State's inquiry and prohibiting discussion of the nature of the Defendant's prior felony convictions. Alternatively, the State argues that any error in the admission of the prior convictions was harmless. We agree with the State.

After reviewing the transcript and confirming that the Defendant had said, "first felony," the trial court limited the extent of the State's inquiry in its evidentiary ruling:

> [I]n order to try and protect the record as much as I can, the way I want to do it is this, at first the State will only be able to ask him about, isn't it true that you were convicted of a felony in Florida in 19 whatever, and then isn't it true you were convicted of a felony in [Georgia]. If he acknowledges the convictions then we will stop there. If he denies the convictions then I will

allow you to introduce the certified certificates of the convictions.  And that will put into evidence what it was that he was convicted of, which is nearly the same thing he's on trial for here.  I will give him the chance to keep that out by acknowledging the convictions.

Following a lengthy cross-examination by the State, the issue of the Defendant's prior convictions was addressed as follows:

Q:      Well, you had an idea about how to get some money, didn't you?  And, in fact, on your direct examination didn't you mention that [the victim] was trying to lure you into this scheme selling prescription medication --

A:      See, you want to twist this.

Q:      -- for money and you couldn't do that, right?  You couldn't do that.  I don't want to use the wrong words, because you said you weren't going to let that be done to you because that first felony would put me in jail.  Right?  You said that?

A:      Yes, I said that.

Q:      You're not going to get me like that.

A:      I mean --

Q:      You said, no, no, you're not going to get me like that.

A:      Right.  And when I said no, no, you're not going to get me like that, you have to understand the first part was Christy had been trying to get me to sell my medication --

Q:      My question was did you say that or not on direct examination?

A:      Oh, yes, I did.  I'm sure.

Q:      Okay.  Well the fact is you are a convicted felon?

A:      Yes, I am.

Q:      You have two felony convictions, correct?

A:      Yes, but --

Q:      One from Georgia and one from Florida?

A:      Yes.

Q:      So there's no question about dealing drugs and it being your first felony conviction, right?

A:      I may have -- my first felony conviction here in Knoxville put me away for life.

Q:      Yes, sorry.  Yeah, that's -- excuse me, I'm sure it was just the location that you were talking about.

A:      I didn't say Knoxville, I'm sure, but --

Q:      But let me move on then . . .

-10-

Thereafter, at the motion for new trial hearing, the trial court held, in pertinent part:

> [H]is testimony was convoluted. It was internally conflicted. And he was trying to distance himself from the whole notion of committing crimes. And I believe that was his intent when he said, I don't want that first felony, I'll go to prison.
>
> As I listened to his testimony and observed his demeanor, that was my interpretation at the time. And I believe that that did open the door simply to the introduction of the fact of the convictions, not anything further. We stayed away from the fact that the prior convictions were for rape.
>
> So the Court limited the prejudicial effect as best I could, but I had to -- this was not evidence that the State introduced in its case in chief as if it were an element of the offense or anything of that nature. It was evidence introduced to impeach him, to contradict his testimony. And I felt that I had to allow the State to do that.

The Defendant now asserts that he was unduly prejudiced at trial with the manner of introduction of his prior felony convictions and that a new trial is warranted. As we have noted, the Defendant's convictions were admitted pursuant to the doctrine of "opening the door" rather than under Rule 609 of the Tennessee Rules of Evidence. Our review of the record shows that the manner in which the Defendant's prior convictions were presented to the jury was not unduly prejudicial. In any event, based on the entire record, the Defendant has failed to show that any error on the part of the trial court in admitting his prior convictions "more probably than not affected the outcome of the trial." See State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008). Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Upon review, we conclude that the trial court did not err in its evidentiary ruling and in the manner in which it controlled the cross-examination of the Defendant. However, any possible error in admitting the prior convictions was harmless in light of the evidence against the Defendant. Accordingly, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE