IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 15, 2006 Session

## STATE OF TENNESSEE  v.  JAMES RIELS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 03-06530     Chris Craft, Judge**

---

### No. W2004-02832-SC-DDT-DD - March 1, 2007

---

The defendant, James Riels, pled guilty to two counts of premeditated  murder and two counts of felony murder for the murders of Mary Jane Cruchon and Franchion Pollack.[1]  He also entered guilty pleas to one count of especially aggravated robbery, one count of attempted especially aggravated robbery, and one count of aggravated burglary.  Following a capital sentencing hearing, the jury found three aggravating circumstances in each murder:  (1) the defendant was previously convicted of one or more felonies, the statutory elements of which involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery.  Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (2003).  The jury found one additional aggravating circumstance with respect to Franchion Pollack: the victim of the murder was seventy years of age, or older.  Tenn. Code Ann. § 39-13-204(i)(14) (2003).  The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Accordingly, the jury imposed a sentence of death for each of the murder convictions.  In a separate sentencing hearing, the trial court imposed an effective thirty-five year sentence for the remaining noncapital convictions, to be served concurrently with the death sentences.[2]  The defendant appealed the sentences of death.  After fully considering the issues raised by the defendant, the Court of Criminal Appeals affirmed the sentences.

Upon automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1) (2003), this Court entered an order specifying four issues for oral argument:[3] (1) whether the trial court erred in

---

[1] The trial court merged the felony murder convictions with the premeditated murder convictions, resulting in two first degree murder convictions.

[2] The non-capital sentences are not at issue on appeal.  Riels raised no specific issues with respect to these non-capital offenses and sentences.  Furthermore, because he pled guilty to those offenses without preserving as a certified question the issue of admissibility of his confession and the evidence obtained therefrom, those judgments are final.

[3] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument."  Tenn. Sup. Ct.

(continued...)

allowing the State to cross-examine the defendant regarding the circumstances of the offenses and, if it did, was the error harmful; (2) whether the sentence was invalid under any of the mandatory issues for review set out in Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) (2003); (3) whether the trial court's instruction to the jury that aggravated robbery is a felony whose statutory elements involve the use of violence to the person violated the Sixth and Fourteenth Amendments of the United States Constitution; and (4) whether the trial court erred in denying the defendant's motion to suppress. After a careful review of the record and relevant legal authority, we hold that the trial court erred in allowing the State to cross-examine the defendant and that the error was reversible. Therefore, we reverse the judgment of the Court of Criminal Appeals and remand the case for a new capital sentencing hearing.

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Reversed and Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., and D. MICHAEL SWINEY, SP.J., joined.

Tony N. Brayton, Garland Erguden, and Robert Wilson Jones (on appeal) and Larry Nance and LaTonya Burrow (at trial), Memphis, Tennessee, for the appellant, James Riels.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Michelle Chapman McIntire, Assistant Attorney General, William L. Gibbons, District Attorney General; and Gerald Harris and Michele Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

On April 21, 2003, the defendant, James Riels, was working for contractor Allen Johnson at the house of Franchion Pollack. Ms. Pollack lived alone at 3810 Shirlwood in Memphis, Tennessee. She was eighty-nine years old. Riels arrived at her house at about 8:00 a.m. and was there off and on throughout the day until about 4:00 p.m., when he went to his boss's house to drop off his equipment.

Riels then drove around in search of cocaine. After running out of money around 6:30 or 7:00 p.m., he drove back to Ms. Pollack's house. At that time, Ms. Pollack's next door neighbor, Mary Jane Cruchon, age fifty-nine, was with Ms. Pollack. The two were very close and spent a lot of time together; Ms. Cruchon helped look after and take care of the older woman. When Riels arrived at Ms. Pollack's house, he "tried to con [her and Ms. Cruchon] out of some money."

---

[3] (...continued)
R. 12.2.

When the women refused to give him any money, Riels "got aggravated" and went out to his truck and got a claw hammer. He went back into the house and led Ms. Cruchon into the hallway, where he proceeded to hit her in the head and face with the hammer until she was no longer moving. He then led Ms. Pollack from the kitchen into the hallway and hit her in the head with the hammer. Ms. Pollack fell to the ground, and Riels hit her again. After the second blow, Ms. Pollack did not move. Riels also killed Ms. Cruchon's dog with the hammer because the dog was "barking real loud."

Riels then searched Ms. Pollack's house for money. He found some change, which he took with him. He went next door to Ms. Cruchon's house where he was unsuccessful in finding money. At this point he returned to Ms. Pollack's house and took her television.

Riels sold the television in exchange for some cocaine and "proceeded to drive around and get high." He picked up a woman he knew, and they "drove around to prostitute," with her earning the money to provide them with drugs. This continued until around 8:00 or 9:00 p.m. the following evening, April 22nd.

On April 22, 2003, Officer Kenneth Calhoun of the Memphis Police Department and his partner responded to a report that someone was hurt on Shirlwood. When they arrived, Steven Mead, one of the workmen at Ms. Pollack's home, told them that he had discovered two people in the home. When the officers entered the house, they found two women lying in blood in the hallway. Officer Calhoun noticed that the older victim, Ms. Pollack, was still alive. Ms. Pollack was taken to the hospital where she later died from her injuries. The other victim, Ms. Cruchon, was pronounced dead at the scene.

According to the medical examiner, both Ms. Cruchon and Ms. Pollack died of blunt force trauma to the head. Ms. Cruchon sustained fourteen blows to the head, bruises on her left knee and upper right shoulder, tears down both sides of her nose, injuries to the back of both her hands, and impact fractures to two fingers on her right hand. Her injuries were consistent with those that would be inflicted by a claw hammer. Ms. Pollack sustained significant injuries to the back of her head, including trauma to her brain in the area behind her left ear where bone fragments had pierced the brain. It was the opinion of the medical examiner that Ms. Pollack suffered two blows to the head and that these injuries were consistent with those that would be inflicted by a hammer.

The investigation into the homicides was coordinated by Officer Timothy Sims of the Memphis Homicide Squad. As part of his investigation, Officer Sims talked with each employee of the contractor working on Ms. Pollack's home, including Riels.

Riels, accompanied by his mother, voluntarily appeared at the homicide office on April 23, 2003, at approximately 3:00 in the afternoon. Riels was put in one of the interview rooms within the homicide office. Riels was neither handcuffed nor shackled, but the door was locked and Riels would have had to knock on the door in order to leave.

Riels first spoke to Sergeant Fitzpatrick about his activities on April 21, 2003. Riels stated that he had been at Ms. Pollack's residence, went home that afternoon to change clothes, and then went to find a female friend in order to purchase crack cocaine. This friend was located by other officers and her version of the events conflicted with statements made by Riels. This and other parts of Riels' statements caused Sergeant Fitzpatrick and Officer Sims to become suspicious. Officer Sims asked for permission to search the house that Riels shared with his mother.

Riels gave his consent to search his room, and Riels' mother consented to a search of the entire premises. While at the house, Riels' mother led Officer Sims to a garbage can in the driveway which contained clothing that Riels had been wearing on the evening of April 21, 2003. Officer Sims saw what appeared to be blood on a pair of brown boots, a pair of blue jeans, and a blue shirt contained in the garbage can. Officer Sims returned to the police station and placed Riels under arrest, advising him of his rights. After Riels signed an advice of rights statement, he gave a statement in which he confessed to killing the two victims with the claw hammer.

## Procedural Background

On September 18, 2003, a Shelby County Grand Jury charged Riels with one count of first degree felony murder of Mary Jane Cruchon, one count of first degree premeditated murder of Mary Jane Cruchon, one count of first degree felony murder of Franchion Pollack, one count of first degree premeditated murder of Franchion Pollack, one count of especially aggravated robbery of Franchion Pollack, one count of attempted especially aggravated robbery of Mary Jane Cruchon, and one count of aggravated burglary of the habitation of Mary Jane Cruchon.

On October 10, 2003, Riels filed a motion to suppress his statements to police and the evidence obtained from the search of his mother's home, alleging that he was illegally detained and that his consent to search his mother's residence and his statements were not voluntary because he was under the influence of drugs when they were given. Additionally, Riels alleged that he requested but was denied the presence of counsel during questioning. Following a hearing, the trial court denied Riels' motion to suppress.

On August 9, 2004, Riels entered guilty pleas to all seven counts charged in the indictment. The trial court merged the felony murder convictions with the premeditated murder convictions, resulting in two first degree murder convictions. A capital sentencing hearing commenced on that day.

At the hearing, the State first introduced victim impact testimony from Nadine Cruchon, Mary Jane Cruchon's older sister. Then the State presented proof regarding the crimes, the investigation, and Riels' admission of guilt. The Shelby County Medical Examiner testified as to the cause of death as well as the extent of injuries sustained by both women. Lastly, the State introduced evidence of Riels' prior convictions through the testimony of a clerk for the Shelby County Criminal Court Clerk's Office. Riels had previously pled guilty to aggravated robbery twice in 1997 and once in 1995.

In mitigation, the defense first presented testimony from Dr. Murray Smith, a specialist in addiction medicine. Dr. Smith reviewed Riels' prior hospital records and interviewed Riels about his childhood and chemical dependency. Dr. Smith concluded that Riels "met all of the diagnostic criteria for chemical dependency." He testified that crack cocaine is one of the "most powerfully addictive substances" and one of the most difficult addictions to treat. During a high, the user feels like "Superman," and when the feeling subsides, the user is left with such a strong desire to repeat that feeling "that anything that gets in their way of getting that dose is their enemy."

Next, several members of Riels' family testified about their relationships with Riels, both past and current, as well as the negative impact it would have on their lives if Riels were sentenced to death.

Riels testified as the final witness. Prior to his taking the stand, the trial court made several rulings regarding potential cross-examination by the State. Specifically, the trial court ruled that if Riels testified regarding his drug addiction, then the State would be allowed to cross-examine him about the circumstances of the offenses. The court also stated that the State could cross-examine Riels about the circumstances of the offenses if Riels "got on the stand and started saying residual doubt, or I really didn't know what I was doing."

During his direct testimony, Riels acknowledged that he had accepted responsibility for the crimes. He testified about his relationships with his family, and in particular, his strained relationship with his father and his close relationship with his mother. At that point he was asked if there was anything that he would like to say to the family and friends of the victims. Riels responded as follows:

> I'd like to say that I'm sorry for their loss. I didn't mean for any of this to happen. I didn't want to hurt anybody. If I could take it all back, I would. And I'd like to say to their family members and their friends that I am truly sorry for what I did. If there was ever anything that I could do, I would do it, but I don't know that there is. I would like to apologize for what I did. They didn't deserve any of this and there's no excuse for what I did. That's all I have to say about that.

The defense then rested.

Immediately following Riels' testimony, the trial judge called both parties to the bench, sua sponte, where the following colloquy ensued:

> THE COURT: The statements that he made, "I didn't mean for it to happen, I didn't want to hurt anybody", flies in the face of facts in the confession. I think that he's opened the door now to the circumstances. I'm just letting y'all know, because of those statements, I would allow the state to ask him things in the statement that he says that after he hit her and she was on the ground, then he kept hitting her until she didn't move anymore, that's just one example. So if y'all want

to get into the addiction, I'm just letting you know, the door's been opened at this point.

MR. NANCE [Attorney for Riels]: Well, my characterization of it would be simply as an expression for remorse.

THE COURT: No, sir. He was saying that he didn't want to hurt anybody. He gave a [sic] factual testimony of his culpable mental state at the time, which the state has a right to cross-examine him on. It's just an absolute – "I didn't want to hurt anybody, I didn't mean for it to happen", so all I'm saying is this, the door has been opened to his culpable mental state during the offense, itself. . . .

At this point, because the trial court held that Riels' testimony had opened the door for cross-examination concerning all of the circumstances of the murders, defense counsel resumed eliciting direct testimony and asked questions regarding Riels' drug addiction.

Following the trial court's ruling, the State proceeded to cross-examine Riels as to the circumstances of the crimes, eliciting very detailed testimony about the attack, to the point of requiring Riels to come down off the witness stand and demonstrate how he beat Ms. Cruchon with the claw hammer. The questioning proceeded as follows:

Q. When you struck her the first time, what did she do?

A. She fell to the floor.

Q. When you struck her the first time, Mr. Riels, did you use the ball, or the little part of the hammer, or did you use the claw?

A. I don't remember.

Q. Let me refresh your memory if I can, please, or attempt to.

. . . .

Q. This photograph of this woman, was that number one blow? When you raked the claw down her face? Was that number one blow, Mr. Riels?

A. No.

Q. So then you must have done that after she was already on the floor; is that correct?

A. I believe so.

Q.    Did you have to bend over her, like this, to hit her, after she's on the floor?

A.    Yes.

Q.    Show us how you did that?  Would you mind stepping down and just show us the posture you took when you hit her, that blow, with the claw that tore her face open?  Could you do that for us, please, sir?

A.    If I have to?

      THE COURT:  Yes, sir. . . .

      (Defendant complied)

Q.    Now, when you hit her the first time, were you facing her?

A.    No.

Q.    You hit her in the back of the head?

A.    Yes.

Q.    And she fell?

A.    Yes.

Q.    When you hit her the first time did you hit her with the ball part of the hammer?

A.    I don't remember.

Q.    You don't remember.  And she falls down; is that correct?

A.    Yes.

Q.    Now, I want you to take this jury through where you were when you hit her, that blow that I showed you in state's exhibit number sixteen?  What was your position?

A.    Leaning over a little.

Q.    A little?  You had to bend you knees didn't you, young man?

A.      I don't recall.  I don't believe that I had to go that low.

Q.      She's laying on the ground and you're up here, you've got to come down and
        bend your knees, if that's true.  Did you not have to get right in the middle of
        her face to do it?  Stand right over her and look at her when you were doing
        that?

A.      (No audible reply).

Q.      You can resume your seat, if that's all right with Your Honor?

        THE COURT:  Yes.

Q.      Sir?

A.      What are you asking me?

Q.      I'm asking you didn't you have to just kneel over her and just look at her
        right there in the face to center that blow the way you did right over her nose
        and scrape that off with the claw?  Did you not have to do that?

A.      Yes.

        The jury imposed the death penalty for the murder of each victim.  In the death of Mary Jane
Cruchon, the jury unanimously found the presence of three statutory aggravating circumstances:
Riels had prior convictions for violent felonies; the murder was especially heinous, atrocious, or
cruel; and the murder was committed while committing or attempting to commit a robbery.  In the
death of Franchion Pollack, the jury unanimously found the presence of four statutory aggravating
circumstances: Riels had prior convictions for violent felonies; the murder was especially heinous,
atrocious, or cruel; the murder was committed while committing or attempting to commit a robbery;
and the victim was seventy years of age or older.  The jury further found that the aggravating
circumstances outweighed any mitigating circumstances.  On appeal, the Court of Criminal Appeals
upheld the sentences of death.

## Analysis

### A. Cross-examination Regarding Circumstances of Offense

        The Fifth Amendment to the United States Constitution, applicable to the states through the
Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 6 (1964), provides that "[n]o person . .
. shall be compelled in any criminal case to be a witness against himself."  Likewise, article I, section
9 of the Tennessee Constitution provides that a defendant "shall not be compelled to give evidence
against himself."  The right against self-incrimination extends to capital sentencing proceedings.  See

Estelle v. Smith, 451 U.S. 454, 462-63 (1981); see also State v. Cazes, 875 S.W.2d 253, 265 (Tenn. 1994).

The United States Supreme Court held, in Harrison v. United States, 392 U.S. 219, 222 (1968), that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives . . . ." See also State v. Gilbert, 751 S.W.2d 454, 463 (Tenn. Crim. App. 1988) (holding that "[w]hen the defendant elected to testify in support of his defense, and took the witness stand, he waived his constitutional rights, federal and state, against self incrimination"). This flows from the general rule of evidence that "[a] witness may be cross-examined on any matter relevant to any issue in the case . . . ." Tenn. R. Evid. 611(b).

However, cross-examination of a defendant during a capital sentencing hearing may be restricted due to "the gravity of [the] proceeding and the constitutional mandate to ensure that all relevant mitigating circumstances be presented to a sentencing body." Cazes, 875 S.W.2d at 266.

> [I]n the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does *not* operate as a complete waiver of the privilege against self-incrimination. Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial.

Id. (footnote omitted). This does not eliminate all cross-examination–a defendant still may be completely cross-examined about all testimony given or fairly raised by the defendant on direct examination. Id.

Riels argues that the trial court erred in allowing the State to cross-examine him regarding the circumstances of the crimes, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 9 and 13 of the Tennessee Constitution. Riels first argues that the court erred in ruling, sua sponte, that any testimony regarding his drug addition would open the door to cross-examination by the State regarding the circumstances of the offenses. Riels next argues that the court erred in ruling that his statements expressing remorse were statements denying responsibility, thereby opening the door for cross-examination. The State counters that Riels' statements that he did not intend to hurt the victims properly opened the door for cross-examination regarding the circumstances of the crimes because it raised the issue of his mental state.

Prior to Riels taking the stand in his own defense, the trial court raised the question of whether the defendant planned to testify about his drug addition. The trial court indicated that if he did, it would rule that such testimony opened the door to cross-examination about the circumstances of the offense because the defendant's drug use went "directly to his culpability for the offense and his actions." The court said that if the defendant "wished just to express remorse, or something like that, then that would be fine." The trial court further indicated that any residual doubt evidence or

testimony that the defendant did not know what he was doing would also open the door to cross-examination regarding the facts of the offense. The trial court indicated that it initiated this inquiry to assure itself that the defendant's decision to testify was knowing and intelligent.

Riels took the stand and testified about his remorse and his relationship with his family. He also admitted that he had prior convictions for aggravated robbery and forgery. At the conclusion of this testimony, he addressed the family and friends of the victims:

> I'd like to say that I'm sorry for their loss. I didn't mean for any of this to happen. I didn't want to hurt anybody. If I could take it all back, I would. And I'd like to said to their family members and their friends that I am truly sorry for what I did. If there was ever anything that I could do, I would do it, but I don't know that there is. I would like to apologize for what I did. They didn't deserve any of this and there's no excuse for what I did. That's all I have to say about that.

Following this testimony, the defense rested.

The trial court sua sponte called a bench conference, at which time it ruled that the statements, "I didn't mean for any of this to happen" and "I didn't want to hurt anybody" had contradicted the defendant's confession and opened the door to cross-examination regarding the circumstances of the offenses.

The Court of Criminal Appeals disagreed with the trial court's conclusion that the defendant opened the door to cross-examination about the circumstances of the offenses. The Court of Criminal Appeals was of the opinion that the defendant's statements were simply his attempt at expressing remorse to the victims' families and friends about the crimes that he had already admitted committing. The court found even more troubling the trial court's calling the parties to the bench and sua sponte announcing that the defendant opened the door for the cross-examination. At that time, the State had not yet raised the issue and might never have raised the issue. We agree.

First, it is clear that the statements made by Riels, when taken in context, were not an attempt to deny responsibility, but were merely an attempt to express his remorse. He had already acknowledged that he had taken responsibility for the crimes. He also stated that "I would like to apologize for what I did. They didn't deserve any of this and there's no excuse for what I did." Taking all of his statements together, those cited by the trial court, that "I didn't mean for any of this to happen" and "I didn't want to hurt anybody," simply add to Riels' expression of remorse and his desire that "[i]f [he] could take it all back, [he] would."

Therefore, like the Court of Criminal Appeals, we conclude that the trial court erred in holding that Riels' statements opened the door for full cross-examination on the details of the murders. Riels was thus denied his right against self-incrimination, in violation of the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution.

The trial court's actions raise an additional concern. We do not necessarily fault the trial court for reminding the defendant prior to his testifying that he might wish to limit his testimony if he did not want to run the risk of opening the door to unlimited cross-examination. However, we do fault the trial court for raising the issue sua sponte and concluding that the defendant had opened the door to unlimited cross-examination by making statements that the trial judge perceived to be a denial of criminal culpability. This is particularly troubling in light of the fact that the State never raised the issue nor argued its position on the issue once raised.

This case serves as a reminder that trial judges should always use restraint and not interject themselves into a role in a trial which may be perceived as that of an advocate rather than an impartial arbiter. While we are confident that the trial judge in this case had no improper motives, nevertheless, his sua sponte ruling has led to reversible error.

While the Court of Criminal Appeals held that the trial court's actions, though error, were harmless, we disagree and hold that the error is reversible. The trial court's error affected a constitutional right of the defendant. By finding that Riels' statements of remorse opened the door to full cross-examination on the circumstances of the crimes, the trial court violated Riels' right to avoid self-incrimination. While Riels had already admitted his culpability for the crimes charged by pleading guilty, he still had the constitutional right not to be a witness against himself.

If the error is of a constitutional nature, as it is here, the burden shifts to the State to prove that the error–the deprivation of the constitutional right–was harmless beyond a reasonable doubt. Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999); State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999). "An error affecting a constitutional right is presumed to be reversible, and any such error will result in reversal of the conviction unless the State proves beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001) (citing Harris, 989 S.W.2d at 315).

In concluding that the error was harmless, the Court of Criminal Appeals reasoned that the jury was not prejudiced by the detailed account of the attack or the State's request that Riels act out the attack because the jury had already heard Riels' confession read into the record which described the attack, had heard graphic testimony from the medical examiner concerning the victims' injuries, and had seen photographs of Ms. Cruchon and the crime scene.

We hold, however, that the State has failed to show, beyond a reasonable doubt, that the trial court's error did not affect the outcome of the trial. While the evidence already before the jury gave them a fairly clear picture of what happened during the attack, hearing such details from third parties does not have nearly the same impact as hearing detailed, graphic descriptions from the defendant himself. This is compounded by the State's request that Riels act out for the jury how he attacked Ms. Cruchon with the hammer once she had already fallen to the floor. Such a visual demonstration

was meant to, and surely would, inflame and prejudice the jury against the defendant.[4]

For the reasons outlined above, we hold that the trial court committed reversible error when it ruled that Riels' testimony opened the door for unlimited cross-examination. Therefore, we remand this case to the trial court for a new capital sentencing hearing.

### B. Remaining Issues Raised By Riels

Because we are remanding this case for a new sentencing hearing, many of the remaining issues raised by Riels are moot. However, we will briefly address those issues which will likely be relevant upon remand.

### 1. Admission of the Photograph

Riels argues that the trial court erred in allowing the admission of the photograph of the victim lying in the hallway surrounded by blood. The Court of Criminal Appeals upheld the trial court's decision to admit the photograph on grounds that its admission was not properly objected to and also because admission of evidence is within the sound discretion of the trial court. Whether the photograph was properly objected to at trial is certainly now moot on appeal.

Upon remand, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see also State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999). However, photographs may not be admitted solely to inflame the jury and prejudice the defendant. Banks, 564 S.W.2d at 950-51. The photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. app. denied, (Tenn. 1993); see also Tenn. R. Evid. 402. Moreover, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 103; Braden, 867 S.W.2d at 758; see also Tenn. R. Evid. 403.

### 2. Jury Instruction on Prior Offenses

Riels argues that the instruction to the jury that aggravated robbery was a felony whose elements involved the use of violence was unconstitutional under Apprendi v. New Jersey, 530 U.S.

---

[4] With respect to the State's specific request that Riels' come down off the witness stand and demonstrate his attack on the victim, we can think of no circumstance in which such evidence should be admissible during a capital sentencing hearing. Evidence may not be admitted solely to inflame the jury and prejudice them against the defendant. State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). Even if relevant, evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. "Thus evidence which would advance the inquiry but would also inflame or unduly distract the jury or require an undeserved expenditure of judicial time or unfairly surprise the opponent may not be admissible." McCormack v. Riley, 576 S.W.2d 358, 360 (Tenn. Ct. App. 1978).

466 (2000), and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). At the time of the trial in this case, this issue had not yet been resolved by this Court. Since that time, we have held that the determination of whether the statutory elements of a felony involve the use of violence to the person is a legal determination for the trial court. <u>See</u> <u>State v. Cole</u>, 155 S.W.3d 885, 899-905 (Tenn. 2005). More recently, we interpreted the holding in <u>Shepard v. United States</u>, 544 U.S. 13 (2005), to impose a limit on the trial court such that it may only consider the statutory definition of the offense, the charging document, the written plea agreement, the transcript of the plea colloquy, and any explicit factual findings by the trial judge to which the defendant assented. <u>See</u> <u>State v. Ivy</u>, 188 S.W.3d 132, 151 (Tenn. 2006). Although the issue is moot on appeal, it appears that the trial court based its instruction on the indictments and judgments from the prior convictions, and therefore such instruction would not have been in error.

### 3. *Instruction on Victim Impact Testimony*

Riels argues that the instruction given to the jury on victim impact testimony was a coercive jury instruction. Because we are remanding for a new sentencing hearing, this issue is moot. However, as noted by the Court of Criminal Appeals, the instruction given by the trial court in this case was the instruction recommended by this Court in <u>State v. Nesbit</u>, 978 S.W.2d 872, 892 (Tenn. 1998), and was subsequently discussed and approved by this Court in <u>State v. Reid</u>, 91 S.W.3d 247, 282-83 (Tenn. 2002).

### 4. *Motion to Suppress*

Riels argues that the trial court erred in denying his motion to suppress his statements and the evidence obtained as a result of those statements. As to this issue, we adopt and incorporate by reference the opinion of the Court of Criminal Appeals, attached hereto in the Appendix.

### 5. *Constitutionality of Tennessee's Death Penalty*

Riels argues that Tennessee's death penalty statutes are unconstitutional. As to this issue, we adopt and incorporate by reference the opinion of the Court of Criminal Appeals, attached hereto in the Appendix.

### 6. *Mandatory Review under Tennessee Code Annotated section 39-13-206(c)(1)*

Riels argues that the imposition of the death penalty was arbitrary and capricious. Because we are remanding for a new sentencing hearing, this issue is moot.

### Conclusion

In sum, we hold that the trial court erred in sua sponte raising the issue of whether Riels' testimony opened the door for unlimited cross-examination by the State and in determining that it did so. We further hold that this error was reversible and therefore remand the case for a new capital

sentencing hearing.  Because we are remanding this case, many of the other issues raised by Riels have become moot.  With respect to Riels' motion to suppress, we incorporate by reference the opinion of the Court of Criminal Appeals, attached hereto in the Appendix, affirming the trial court's denial of that motion.

Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE