IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2015

## STATE OF TENNESSEE v. ANTWON THOMAS

Direct Appeal from the Criminal Court for Shelby County
No. 13-02483    J. Robert Carter, Jr., Judge

No. W2014-00788-CCA-R3-CD – Filed December 22, 2015

A Shelby County Criminal Court Jury convicted the appellant, Antwon Thomas, of assault by bodily injury and domestic assault, Class A misdemeanors. The trial court sentenced the appellant to eleven months, twenty-nine days for each conviction to be served as two years on probation and merged the convictions. On appeal, the appellant contends that the trial court committed plain error by failing to admit the entire recording of the victim's 911 call into evidence, that the evidence is insufficient to support the convictions, that the trial court committed plain error by making improper comments on the evidence, that the trial court committed plain error by refusing to allow him to sit at counsel's table, and that the trial court committed various sentencing errors, including rendering him infamous. Based upon the record and the parties' briefs, we affirm the judgments of the trial court but remand the case to correct a clerical error in the judgment for count three rendering the appellant infamous.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Phyllis Aluko (on appeal) and Nigel Lewis (at trial), Memphis, Tennessee, for the appellant, Antwon Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# I. Factual Background

In May 2013, the Shelby County Grand Jury indicted the appellant for count one, aggravated assault by strangulation, a Class C felony; count two, aggravated assault by use or display of a deadly weapon, a Class C felony; and count three, domestic assault, a Class A misdemeanor. The alleged victim of the crimes was the appellant's then-girlfriend, Jildale Dyson.

At trial, the victim testified that she met the appellant in early 2012 and dated him for nine months. At some point, the appellant moved in with the victim. On December 21, 2012, the victim and the appellant were still living together, and the appellant had two jobs. The victim also was employed, and both of them went to work that day. The victim got home about 5:00 p.m., and the appellant got home about 6:45 p.m. The victim said the appellant was supposed to give her money for "his share of the bills" and to pay off their Christmas layaway at Kmart for his three children and her four children. The victim was expecting the appellant to give her $900 to $1,400.

The victim testified that when the appellant got home, she asked if he had the money, and he told her that he did not have all of it. The appellant said he had been paid $800 and would give her $600, but the victim told him that "that's not enough, that's not going to work." She said that the appellant "kind of threw" the money at her and that she told him, "[I]f this [is] how you think you're going to do, you're not going to stay here." The victim said that she and the appellant argued, that he "smacked" her face, and that she probably hit him back. The appellant "went to try to grab the money as [she] was grabbing the money," and they struggled. The appellant picked up the victim by her neck and held her against the wall. The victim said that the appellant's hands were around the base of her neck, that he was choking her, and that she was gasping for air. The appellant released the victim, and she may have hit him. The appellant then dragged the victim across the carpet by her hair.

The victim testified that her four children, ages one, two, six, and seven, were home at the time of the incident. The appellant released the victim and went into the bathroom, and the victim went into her daughter's bedroom to check on the children. She and the appellant exited the rooms at the same time and were facing each other in the hallway. The victim said that the appellant had his two guns, that he pointed one of them at her, and that he told her, "[B]itch, you think you going to play with me? I'll kill you and everything in this mother [f***er]." The victim said she was afraid because she "didn't know if he was serious or not."

The victim testified that the appellant left in his Jeep, that she cleaned herself, and that she calmed her children. She then sat in the living room, waiting to see if the appellant would return. She also waited to make sure her children were asleep. About one hour later, the victim telephoned the police. When the police arrived, she told them what had happened and showed them her injuries. Later that night, the victim packed the appellant's belongings, put them in the carport, and informed the appellant's mother that his things were outside. The next day, the victim had her security system reprogrammed and the locks on her doors changed. She said she feared for her safety because the appellant had a key to her home. That afternoon, the appellant arrived to pick up his property. The victim telephoned the police, and they arrived and arrested the appellant.

The victim testified that the appellant's hitting her face caused bruising and redness on the right side, that his choking her caused brusing on the front of her neck and scratch marks on the side of her neck, and that his dragging her across the carpet caused burns on her right leg and knee. The victim identified photographs of her injuries. She also identified receipts showing that on December 22, 2012, she paid ADT $436.15 to install new alarm keypads and reset her alarm code and a locksmith $200 to change the "key cylinders" on her doors.

On cross-examination, the victim testified that the appellant began living with her in September 2012 and that this incident was the first time he had been violent with her. She said the appellant did not buy food for the household but that he helped her children with their homework and occasionally gave her $30 or $40 for weekly expenses. The victim said that she was expecting the appellant to pay his portion of the utility and layaway bills on December 21, and she acknowledged that she became angry when he did not have the money. The victim also acknowledged that she did not call 911 until 7:36 p.m. She said she did not remember telling the 911 operator that the appellant kicked "in" her bedroom door. The victim clarified that the appellant kicked "on" the door. The victim acknowledged that she and the appellant did not have children together but that she may have told the 911 operator the appellant was her "baby's daddy." She also acknowledged that she may have been "pretty cool and calm" on the telephone with the operator.

The victim testified that when the police arrived at her home on December 21, they saw her injuries. However, they did not photograph the injuries until they came to arrest the appellant on December 22. She said that she did not curse at the appellant when he arrived to pick up his belongings and that she did not come out of her home until the police arrived.

Officer Namika Johnson of the Memphis Police Department (MPD) testified that she was one of two officers who responded to the victim's domestic violence call on

December 21. When the officers arrived, the victim told them that she and her boyfriend had been involved in an altercation, that he "pulled a gun on her," and that he choked her. Officer Johnson saw an injury on one of the victim's knees.

On cross-examination, Officer Johnson testified that her partner took the victim's statement. Officer Johnson saw redness on the victim's neck but did not see any bruising on the victim's neck or face at that time. She also did not see any signs of a struggle in the victim's home.

Officer Cedric Foster of the MPD testified that he was one of two officers who responded to the victim's call on December 22 and arrived between 3:00 and 4:00 p.m. The victim was standing outside and was talking with the appellant. The officers detained the appellant and spoke with the victim. Officer Foster saw "marks and bruising" around the victim's neck and bruising on her knees and photographed the injuries. He did not see any injuries on the appellant and transported the appellant to the Felony Response Unit of the police department.

On cross-examination, Officer Foster testified that he searched the appellant but did not find any weapons. Officer Foster did not search the appellant's vehicle. At the conclusion of Officer Foster's testimony, the State rested its case.

Officer Jeremiah King, the supervisor and keeper of records for the MPD's 911 Communications, testified that his office prepared a recording of a call made from Gadwell Road on December 21, 2012. The defense played a portion of the call for the jury.[1]

The appellant testified that he and the victim were in a relationship from February 2012 to December 21, 2012. He and the victim did not have any children together, but he acted as a parent to her children. On December 21, the appellant worked both of his jobs and went home sometime between 6:00 and 7:00 p.m. to "[freshen] up." He said that while he was there, he and the victim "discussed a situation" about his pay. The appellant had received $800 and was going to give the victim $600. The victim wanted the entire amount, but the appellant refused. The victim told the appellant that if he gave her only $600, he "would have to get the [f***] out." The appellant told the victim that he would be "a mother[f***ing] fool" if he gave her the money "to get put out." He said that he did not throw his money at the victim and that "as far as my money ever touching her hands, that never happened." He said that he did not slap, choke, or drag the victim and that he did not point a gun at her.

---

[1] The redacted 911 call is not in the appellate record.

The appellant testified that he left and drove to a friend's house. The next day, he returned to the victim's home to get his belongings, and the victim came outside. The police arrived, spoke with the appellant, and put him into the back of a patrol car. The police spoke with the victim and drove the appellant downtown to talk with an investigator.

On cross-examination, the appellant testified that while he lived with the victim, he never gave her any money to pay bills. He acknowledged that part of the victim's layaway bill was for gifts for his children.

At the conclusion of the proof, the jury convicted the appellant in count one of assault, a Class A misdemeanor, as a lesser-included offense of aggravated assault by strangulation, and acquitted him in count two of aggravated assault by use or display of a deadly weapon. The jury convicted the appellant as charged in count three of domestic assault, a Class A misdemeanor.

## II. Analysis

As an initial matter, the appellant advises this court that his motion for new trial and notice of appeal were untimely. He requests that we waive the timely filing requirement for the notice of appeal and address any issues other than sufficiency of the evidence and sentencing for plain error.

The trial court sentenced the appellant on February 21, 2014, and two judgments of conviction were entered that same day. More than thirty days later, on March 26, 2014, the appellant filed his motion for new trial. Therefore, his motion was untimely. See Tenn. R. Crim. P. 33(b). Moreover, although the trial court denied the appellant's motion for new trial on April 1, 2014, the trial court did not have jurisdiction to hear and determine the merits of the untimely motion, and the court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . [did] not validate the motion." State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). As a result, the appellant's notice of appeal, filed on April 16, 2014, also was untimely. However, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. Crim. P. 4(a). In the interests of justice, we have decided to waive the timely filing of the notice of appeal in this case. However, we will review issues other than sufficiency of the evidence and sentencing, which did not need to be raised in the motion for new trial in order to preserve appellate review, for plain error. See Tenn. R. App. P. 3(e).

We may grant plain error relief if all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations and citation omitted).

## A. 911 Recording

The appellant contends that the trial court committed plain error by failing to admit the victim's entire 911 recording into evidence. The State argues that the trial court did not err. We agree with the State.

After the State concluded its case-in-chief, defense counsel advised the trial court that "I have an officer here from MPD Communication" and that counsel wanted to play a recording of the victim's December 21 call to 911. The State objected on the bases that the caller's voice had not been authenticated by the victim and that the victim "has not necessarily said an inconsistent statement." Defense counsel argued that the recording was not hearsay and that, in any event, the victim's statements qualified as exceptions to the hearsay rule as excited utterances and inconsistent statements.

Defense counsel played the recorded call for the court. During the call, a woman reported that her name was Jildale Dyson and that she lived in a house on Gadwell Drive. She then stated that "my baby's daddy just kicked in my door and jumped on me and took, took $800." The operator asked for the assailant's name, and the woman answered, "Antwon Thomas." The operator asked that the woman repeat the assailant's last name, and the woman whispered, "Thomas, Thomas, Thomas." She told the 911 operator that "he's still here," that "he got two guns on him," and that "he's standing in my living room." The woman said that she was in her bedroom and that "he trying to pull off in his truck." She described the vehicle as a purple Jeep Cherokee with expired tags and said he was traveling toward Shelby Drive. The operator asked if the woman needed an ambulance, and she answered, "No, I'm straight."

The trial court found that the only statement on the recording that was inconsistent with the victim's testimony was "when she says in that very first sentence my baby's

daddy kicked in . . . my door. She's explained what she thinks she said. It sounded to me like [she said] in." Defense counsel noted that the victim also said on the recording that the appellant was still there but testified at trial that she waited until well after he had left to call 911. The trial court replied, "[T]hat first phrase, that first period where she refers to him as her baby's father to me is possibly inconsistent with what she's testified. The rest of it I just don't see how that's inconsistent with anything she's testified to." The trial court noted that defense counsel could have prepared a transcript of the recording and "could have asked her specific examples from it but you didn't." Defense counsel maintained that the recording contained numerous inconsistent statements, and the trial court stated, "[H]ad you questioned the witness about those with some specificity and she testified that she did not say them, then I would let you bring them in but you didn't." The trial court ruled that the appellant could play the portion of the recording in which the victim said that her baby's daddy kicked in her door but that the rest of the recording was inadmissible.

The appellant contends that the trial court erred by refusing to allow him to play the entire recording because the victim's statements were not hearsay and were admissible pursuant to Rule 613(b), Tennessee Rules of Evidence. He also contends that if the statements were hearsay, then they were admissible under Tennessee Rule of Evidence 803(26).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, "[i]f an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay." State v. Wilson, 164 S.W.3d 355, 364 (Tenn. Crim. App. 2010). Given that the appellant wanted to play the recording in order to impeach the victim's testimony, not to prove that her statements on the recording were true, we agree that her statements were not hearsay.

Rule 613, Tennessee Rules of Evidence, allows the use of prior inconsistent statements to impeach a witness. Specifically, a party may interrogate the witness regarding the inconsistent statement as long as the witness is "afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b). If the witness denies or equivocates making the prior inconsistent statement, Rule 613(b) allows counsel to introduce extrinsic proof of the prior inconsistent statement. Neil P. Cohen et al., Tennessee Law of Evidence, § 6.13[5][a] (6th ed. 2011). If the witness admits making the statement, extrinsic proof of the statement would be deemed cumulative and, therefore, inadmissible. Id.

Initially, we note that the appellant never authenticated the recording, which

defense counsel could have easily done by playing the recording for the victim and asking if the voice on the recording was hers. In any event, on cross-examination, defense counsel asked if the victim told the 911 operator that the appellant kicked in her door, and she answered, "He kicked on the door at some point in time. . . . I don't remember saying he kicked in the door, no, I don't." Given the victim's claim that she did not remember making that statement, the trial court properly allowed defense counsel to play that portion of the recording for the jury. Counsel also asked if the victim told the 911 operator that the appellant was her "baby's daddy," and she answered, "I may have said it, yeah." She also said that she may have told the operator that the appellant was still in the house. Because the victim acknowledged making those statements, the trial court properly ruled that they were inadmissible. Defense counsel did not confront the victim with any other statements she made to the 911 operator. Therefore, he did not follow the proper procedure for utilizing the prior statements of a witness and could not introduce the statements as extrinsic evidence. In short, no clear and unequivocal rule of law was breached, and the appellant is not entitled to plain error relief.

## B. Sufficiency of the Evidence

Next, the appellant claims that the evidence is insufficient to support his convictions because the proof failed to show that he "exceeded the permissible boundaries allowed him by law to protect his personal property." In support of his argument, he relies on Tennessee Code Annotated section 39-11-614, which provides for a person's reasonable use of force to protect personal property. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The trial court instructed the jury that misdemeanor assault occurs when a person intentionally or knowingly "causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). The court instructed the jury that domestic assault occurs when a person intentionally or knowingly causes bodily injury to a domestic abuse victim. Tenn. Code Ann. § 39-13-111(b). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). As related to this case, a "domestic abuse victim" is an adult who has lived with a defendant. See Tenn. Code Ann. § 39-13-111(a)(2).

Taken in the light most favorable to the State, the evidence shows that on the evening of December 21, 2012, the victim was expecting the appellant to give her $900 to $1,400 for expenses. When the appellant told the victim that he would give her only $600 of his $800 pay, the victim became angry and told him that he would have to leave. The appellant threw the money at the victim, they argued, and they struggled over the money. The victim testified that the appellant hit her face with his hand, choked her, and dragged her across the carpet. She also identified photographs showing redness on her face, bruising and scratches on her neck, and carpet burns on her knee. Although the jury acquitted the appellant of aggravated assault by strangulation, it obviously accredited the victim's testimony that the appellant caused her bodily injuries. The appellant testified at trial and did not claim that the victim was injured during his attempt to stop her from taking his money. To the contrary, the appellant testified that he did not touch her and that his money never touched her hands. He also did not request an instruction concerning the affirmative defense of protection of property. Thus, we conclude that the evidence is sufficient to support his convictions.

## C. Judicial Commentary on the Evidence

The appellant contends that his trial was "riddled with instances of improper

judicial commentary," most of which occurred during defense counsel's cross-examination of witnesses, and that the trial court's behavior constituted plain error. The State notes that the trial court never directly commented on the evidence and argues that "all of the court's comments related solely to counsel's inappropriate conduct toward the witnesses or his refusal to ask proper questions." We conclude that the appellant is not entitled to relief.

In his brief, the appellant cites to numerous instances in the trial transcript in which he claims that the trial court improperly addressed defense counsel. For example, during counsel's cross-examination of the victim, he asked if she telephoned 911 at 7:36 p.m., and the victim answered that she did not remember the time. Counsel stated that "they documented it and it was at 7:36," and the victim responded, "I don't refute that." The trial court then stated, "Well, [defense counsel], are you testifying today or is the witness? You may put it in the form of a question." Shortly thereafter, defense counsel asked if the victim told the police that the appellant assulted her sometime between 7:20 and 7:30 p.m., and the victim said she did not know. Defense counsel said that "[y]ou were pretty descriptive and detailed a second ago about the incident," and the trial court stated, "[Defense counsel], I'm going to ask you to ask questions, please. Don't argue with the witness." Defense counsel then asked the victim, "And now you're telling us that your memory is not so sufficient in that respect?" The trial court stated, "[T]hat's still not a question. . . . [I]t's for this jury to decide the credibility, what witnesses testified a moment ago or whatever." In another example, defense counsel asked the victim if the appellant "was basically arrested over [her] debts." The victim responded, "Arrested over my debts?" The trial court immediately advised the jury to "disregard that" and gave the following lengthy instruction:

> We are not here to decide layaway issues, financial issues, contribution to home issues, none of that. You're here to answer those three questions in this case for the incidents that are alleged to have occurred on December 21st.
>
> You will answer at the end of this case has the State proven beyond a reasonable doubt that the defendant is guilty in count one, count two, and count three. We're not here to judge whether anybody is a good mother, good father, good husband, good boyfriend, any of that. We're only here to answer those questions about that one day. Do you understand?

In a final example, defense counsel asked the victim on recross-examination, "So [the appellant] was supposed to pay the rent . . . on the 22nd of December?" The trial court

stated, "Do not shout statements at a witness, please. If you want to rephrase that in the form of [a] question, listen to the question and if you can answer it, answer it."

We have listened to a recording of defense counsel's cross-examination of the victim. We recognize that a trial court has broad discretion in controlling the course and conduct of the trial. State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994). Moreover, "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). However, in this case, the trial court frequently interrupted defense counsel, without any objection from the State, and admonished counsel regarding his manner of questioning the witnesses. In some of the examples mentioned above, the court admonished counsel for failing to ask the victim a question when, in our view, the inflection in counsel's voice demonstrated that he may have been doing just that. We note that the court reporter also thought counsel was asking questions in two of the above examples. Furthermore, many of the court's admonishments occurred within the hearing of the jury. Although the trial court never directly commented on the evidence, "trial judges should always use restraint and not interject themselves into a role in a trial which may be perceived as that of an advocate rather than an impartial arbiter." State v. Riels, 216 S.W.3d 737, 747 (Tenn. 2007).

Nevertheless, we conclude that the appellant is not entitled to relief. The victim testified about her injuries and identified photographs of them taken by police. The jury, for whatever reason, chose to discredit the victim regarding the appellant's strangling her and pointing a gun at her, but still found that he caused bodily injury in counts one and three. In our view, the jury carefully considered the proof and convicted the appellant based on the evidence, not on the trial court's comments. Thus, we discern no plain error.

### D. Counsel's Table

The appellant contends that the trial court committed plain error by refusing to allow him to sit at counsel's table. The State argues that the trial court did not err. We agree with the State.

On the morning of the first day of trial, defense counsel advised the court that the appellant had requested to sit at counsel's table. The trial court asked if the appellant was an attorney, defense counsel said no, and the trial court said, "No." On appeal, the appellant claims that the trial court's refusing to allow him to sit at counsel's table was plain error because Local Rule 8.05 of the Shelby County Criminal Court, which provides that a defendant may sit at counsel's table "[w]here space is available" and with the trial court's permission, "clearly contemplates situations where a non-attorney

defendant will be allowed to sit at counsel's table." He contends that the record "clearly establishes" that he needed to sit at counsel's table in order to assist with his trial.

As noted by the appellant, our supreme court has determined that "[w]hile it is the better practice to allow a defendant to sit at counsel table," a trial court's refusal to allow a defendant to sit there "did not impair the defendant's presumption of innocence" and did not "impact the defendant's ability to communicate with his counsel." State v. Rice, 184 S.W.3dd 646, 674 (Tenn. 2006). We note that when defense counsel made the request in this case, he did not allege that the appellant needed to sit with him in order to assist with the trial. Although the appellant now claims that that the trial court's refusal affected his ability to consult with counsel, he has failed to offer even one example of how he was prejudiced by his not being allowed to sit at counsel's table. See id. Therefore, we conclude that the trial court did not err, let alone commit plain error.

E. Sentencing

Finally, the appellant raises several issues regarding sentencing. Specifically, he contends that the trial court mistakenly thought that it had to impose a mandatory $225 fine, that the court erred by sentencing him for both misdemeanor convictions when the court merged the convictions, that the court abused its discretion by ordering him to serve two years of supervised probation, that the court erred by ordering him to pay restitution to the victim, and that the court erred by rendering him infamous. The State argues that the appellant's being rendered infamous on the judgment of conviction was a simple clerical error and that the trial court properly sentenced the appellant in all other respects. We agree with the State.

The State did not present any witnesses at the appellant's sentencing hearing. However, it introduced the appellant's presentence report into evidence. According to the report, the then thirty-six-year-old appellant was single with three children ages six, seven and eight. In the report, the appellant stated that he graduated from high school and that he worked for C.R. England, Inc., a trucking company, from February 2013 to January 2014, when he was fired due to this case. The appellant also stated that he worked for Linc Logistics from January 2012 to January 2013, Simos Staffing from September 2009 to December 2012, and Randstad Staffing from March 2004 to September 2009. In the report, the appellant described his mental health as "poor" due to stress and his physical health as "fair" due to headaches. He denied any use of alcohol or illegal drugs. The report showed that the appellant had two 1994 convictions for grand larceny and second degree burglary in Mississippi when he was seventeen years old and that he served four years of confinement for those convictions.

Dianne Thomas, the appellant's mother, testified that the appellant was employed

at the time of his arrest in this case and that he had "a job waiting on him." She said that she had been present for all of his court dates, that she had a car and a driver's license, and that she would help him satisify any conditions of probation. She acknowledged that the appellant had some issues when he was seventeen years old but said that he had not been in trouble since then and that she would make sure he attended any classes the trial court ordered.

The trial court stated that the appellant had "very serious matters on his record" but that "he's gone twenty years without that and hopefully that was matters of his youth." The trial court noted that the appellant had a consistent employment history "to his credit" but that it was troubled by the fact that the appellant "absolutely does not accept any responsibility in this matter, in fact continues to say it didn't happen." The trial court stated that "I'm going to sentence this in both count one and count three"[2] but ordered that the assault conviction in count one merge into the domestic assault conviction in count three. The trial court also ordered that the appellant serve his sentence as two years of supervised probation and stated that "I think there's a minimum two hundred and twenty-five dollar fine that must be assessed on this." The court ordered that the appellant pay restitution to the victim for the amounts she paid ADT and the locksmith.

We note that appellate review of sentencing issues is "abuse of discretion with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). First, the appellant contends that the trial court erred by imposing a $225 fine because "contrary to the trial judge's assertions, the law doesn't appear to impose a mandatory minimum fine of $225" and because the court failed to consider his ability to pay the fine.

Tennessee Code Annotated section 39-13-111(c)(5) provides,

> In addition to any other punishment that may be imposed for [domestic assault], if, as determined by the court, the defendant possesses the ability to pay a fine in an amount not in excess of two hundred twenty-five dollars ($225), then the court shall impose a fine at the level of the defendant's ability to pay, but not in excess of two hundred twenty-five dollars ($225).

We believe the trial court misspoke in stating that the minimum fine was $225. Although inartfully worded, the statute provides that the trial court is to determine the amount of

---

[2] Although the trial court did not specifically announce the appellant's sentences, the judgments of conviction reflect sentences of eleven months, twenty-nine days.

the fine based upon the defendant's ability pay, but not to exceed $225. Regarding the appellant's ability to pay in this case, the trial court noted his consistent employment history. Moreover, a defendant must establish on appeal why his fine is excessive. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). In this case, the record does not establish that the appellant's fine is excessive.

Next, the appellant contends that the trial court erred by sentencing him for both misdemeanor convictions when the court merged the convictions. Previously, this court stated that when convictions were merged, "the proper practice is to enter only one judgment form with a notation therein that the alternative count is merged." State v. Jose L. Hidalgo, No. M2011-01314-CCA-R3-CD, 2013 WL 1197726, at *11 (Tenn. Crim. App. at Jackson, Mar. 26, 2013). However, our supreme court recently addressed this issue, stating as follows:

> [W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document *for each count*. The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court.
>
> . . . .
>
> When the jury returns guilty verdicts on multiple offenses that eventually will be merged, the best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document.

State v. Marquize Berry, No. W2014-00785-SC-R11-CD, slip op. at 5 (Tenn. Nov. 16, 2015) (order). Thus, the trial court did not err by sentencing the appellant to eleven months, twenty nine days for each conviction.

The appellant also claims that the trial court failed to make the requisite findings needed to apply a felony-length of probation for the merged, misdemeanor convictions. As noted by both the appellant and the State, though, a trial court may sentence a defendant to a period of probation not to exceed two years if the court finds that the period of probation is necessary:

(i) For the defendant to complete any appropriate

- 14 -

treatment program or programs, including, but not limited to, a sanctioned batterer's intervention program, an anger management program or any court-ordered drug or alcohol treatment program;

(ii)  To make restitution to the victim of the offense;

(iii)  To otherwise effect a change in the behavior of the defendant, including, but not limited to, imposing any of the conditions set forth in subsection (d); or

(iv) To protect and better ensure the safety of the victim or any other member of the victim's family or household, as set out in subsections (m) and (n).

Here, the trial court stated that "I think that I'm going to place him on probation for two years with all of the conditions." The trial court immediately then said, "He's got to be evaluated by the domestic violence assessment at the Exchange Club and [complete] any follow-up that they may require." Although the trial court did not explicity state that the extended probation was "necessary" to complete the evaluation, we believe the trial court implicity did so. See State v. Beau Clayton Epperson, No. E2012-00268-CCA-R3-CD, 2013 WL 3466536, at \*5 (Tenn. Crim. App. at Knoxville, June 28, 2013). Thus, we conclude that the trial court made the necessary findings to impose two years of supervised probation.

The appellant contends that the trial court erred by ordering restitution to the victim "because the damages claimed are not damages caused by the alleged crime." We disagree. Generally, the amount of restitution that a defendant may be directed to pay is limited to "the victim's pecuniary loss." See Tenn. Code Ann. § 40-35-304(b). "Pecuniary loss" is defined as "[a]ll special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant." Tenn. Code Ann. § 40-35-304(e)(1). "Special damages" are defined as "the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case[.]" State v. Lewis, 917 S.W.2d 251, 255 (Tenn. Crim. App. 1995) (internal quotation marks and citation omitted). The appellant was convicted of assaulting the victim, and he did so in the home they shared and while her young children were present. The victim testified at trial that she was in fear because the appellant had a key to her house and that she spent almost $700 the day after the assault to have her security system and locks changed. In our view, the victim's expenses qualify as "special damages."

Finally, the appellant contends that the trial court erred by rendering him infamous. On the judgment form for count three, a box is marked beside the following statement: "The Defendant having been found guilty is rendered infamous and ordered to provide a biological specimen for the purpose of DNA analysis." However, as noted by the State, the trial court made no such pronouncement during the sentencing hearing; therefore, the marking appears to be a clerical error. The State acknowledges that the appellant should not have been rendered infamous for his misdemeanor convictions. See Tenn. Code Ann. § 40-35-112 (providing that "[u]pon conviction for any felony, it shall be the judgment of the court that the defendant be infamous and be immediately disqualified from exercising the right of suffrage"). Therefore, the case is remanded to the trial court for correction of the judgment for count three to reflect that the appellant is not rendered infamous.

## III. Conclusion

Based upon the record and the parties' briefs, the appellant's convictions and the trial court's sentencing decisions are affirmed. However, the case is remanded to the trial court for correction of the judment for count three to reflect that the appellant is not rendered infamous.

_____
NORMA MCGEE OGLE, JUDGE