FILED

07/13/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2017 Session

**STATE OF TENNESSEE v. ARNOLD TRAVIS NUNNERY**

**Appeal from the Circuit Court for Lewis County**
**No. 2015-CR-84     Deanna B. Johnson, Judge**

_____

**No. M2016-01932-CCA-R9-CD**

_____

The Defendant was indicted for driving under the influence of an intoxicant (DUI); driving with a blood alcohol concentration of .08 or more (DUI per se); DUI, second offense; and unlawful possession of a weapon. The Defendant filed a motion to suppress evidence obtained as a result of a blood draw taken pursuant to a search warrant, and the trial court granted the motion. The State sought and was granted permission to appeal pursuant to Tennessee Rule of Appellate Procedure 9. We hold that the police officer's execution of the search warrant was unconstitutional, that exigent circumstances did not justify the blood draw, and that the good faith exception does not apply. Accordingly, we affirm the trial court's judgment suppressing the results of the blood draw and remand the case to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed; Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Nichole Dusche', Assistant District Attorney General, for the appellant, State of Tennessee.

Vanessa Pettigrew Bryan, District Public Defender; and Jakob Schwendimann, Assistant Public Defender, for the appellee, Arnold Travis Nunnery.

**OPINION**

## FACTUAL AND PROCEDURAL HISTORY

Following a traffic stop in Lewis County, Tennessee, the Defendant was arrested for DUI. After the Defendant refused to consent to a blood draw, the arresting officer obtained a search warrant. The search warrant, which was signed by the local magistrate, "commanded" the officer to "take custody of the suspect and transport the suspect to a person qualified to draw blood in Lewis County, Tennessee" and to "search for, seize and maintain as evidence the property described in said Affidavit, to-wit: human blood from the body of the [Defendant]."

The arresting officer transported the Defendant to a hospital in Lewis County, but the registered nurse declined to draw the Defendant's blood because the Defendant refused to cooperate. After contacting an assistant district attorney, the officer transported the Defendant to a hospital in Perry County, where a registered nurse drew the Defendant's blood.

The Defendant was subsequently indicted on charges of DUI; DUI per se; DUI, second offense; and unlawful possession of a weapon. The Defendant filed a motion to suppress evidence obtained as a result of the blood draw. He alleged that the search warrant required that it be executed in Lewis County and medical personnel in Perry County were not authorized to draw his blood based on the language of the search warrant. The State filed multiple responses in which it contended that the issuance and execution of the search warrant complied with Tennessee Rule of Criminal Procedure 41, that the registered nurse who drew the Defendant's blood was authorized to do so, and that the blood draw was otherwise justified based on exigent circumstances.

During the suppression hearing, Lieutenant Robert Earl Taylor of the Hohenwald Police Department testified that on July 17, 2014, at approximately 7:16 p.m., a caller reported observing someone throwing beer cans out of a white Chevrolet pick-up truck that was traveling into the town on Highway 48 North. Lieutenant Taylor attempted to locate the truck. He saw a truck matching the description pull into a driveway, back up onto the street, and drive down the street. As the truck passed in front of Lieutenant Taylor, he observed that the driver was not wearing a seatbelt. Lieutenant Taylor followed the truck until he confirmed with the dispatcher that it was the truck for which he was searching. Lieutenant Taylor then activated his blue lights and attempted to stop the truck. He said the truck did not stop immediately. Rather, the truck traveled through an intersection, continued to travel at a very slow rate of speed, and turned left onto a street approximately 150 to 200 yards away from the intersection. The truck then entered a driveway. The time of the stop was 7:24 p.m.

As Lieutenant Taylor approached the truck, the driver, whom the officer identified as the Defendant, rolled up the window and stepped out of the truck. Lieutenant Taylor detected an odor of alcohol coming from the truck or the Defendant. The Defendant's face and head were extremely red; his eyes were glassy; and he was unsteady on his feet. When Lieutenant Taylor asked the Defendant if he had been drinking alcohol, the Defendant replied that he drank five beers after he left work at 4:30 p.m. Lieutenant Taylor said that the Defendant's speech was slurred and that the Defendant did not want to speak to him.

Lieutenant Taylor asked the Defendant for his driver's license and proof of insurance. The Defendant provided him with his license and an expired insurance card. The Defendant said he believed he had an updated insurance card in the glove compartment of his truck and requested permission to retrieve it. Lieutenant Taylor saw a shotgun leaned up against the seat of the truck and asked the Defendant whether it was loaded. The Defendant responded, "[W]hat good is it if it's not loaded?" As a result, Lieutenant Taylor did not allow the Defendant to retrieve the insurance card. Lieutenant Taylor had the Defendant perform field sobriety tests, including the "Walk and Turn" and the "One-Leg Stand." Lieutenant Taylor said the Defendant's performance on the tests was "very poor."

Lieutenant Taylor arrested the Defendant for DUI. He sought the Defendant's consent for a blood draw and read the implied consent form to the Defendant. The Defendant refused to sign the implied consent form and stated that "no one was sticking him with a needle." Lieutenant Taylor contacted the dispatcher and learned that the Defendant had prior convictions for DUI in 1989 and in 2008. At 7:44 p.m., Lieutenant Taylor transported the Defendant to the Lewis County Jail and began the process of obtaining a search warrant.

While the Defendant was in jail, Lieutenant Taylor completed the application for the search warrant and the supporting affidavit at the police department. The magistrate met Lieutenant Taylor at the police department and signed the search warrant at 8:28 p.m.

The magistrate also signed an "Order for Assistance in Execution of Search Warrant" that was directed to "any physician, nurse, medical technician, or phlebotomist, licensed by the State of Tennessee, or other person qualified in the intravenous removal of human blood." This order was a preprinted form that noted that a search warrant had been issued for a blood draw. The Defendant's information was handwritten in blanks in the form order. The form order "commanded" the medical professional to cooperate with the officer requesting assistance in the execution of the warrant. The form order also provided that "**[a]ny individual who fails to comply with this Order when requested**

**shall be liable for contempt of this Court and subject to all penalties authorized by law.**"

Upon obtaining the search warrant, Lieutenant Taylor retrieved the Defendant from the Lewis County Jail and transported him to a medical facility in Lewis County to draw his blood. They arrived at the medical facility approximately ten to fifteen minutes after Lieutenant Taylor obtained the search warrant. Lieutenant Taylor met with Joe Lineberry, the on-duty nurse, and asked him to assist in the blood draw. Lieutenant Taylor said the Defendant was combative and repeated that "nobody is sticking a needle in him, nobody is taking his blood." Mr. Lineberry declined to draw the Defendant's blood and informed the officer that the facility's policy was to decline to withdraw blood by force from someone who refused to cooperate.

Lieutenant Taylor reminded Mr. Lineberry that he had a search warrant, but Mr. Lineberry stated that he could not draw the Defendant's blood due to the policy of the medical facility. Lieutenant Taylor had Mr. Lineberry sign a "State of Tennessee Medical Provider Refusal to Comply with TCA 55-10-406(f) Request for Blood Withdrawal." The form set out section 55-10-406(f) and noted that its effective date as January 1, 2012. The form provided as follows:

> I have been informed that as of July 1, 2009 the law mandates that an officer **SHALL** cause a driver to be tested as described in the copy of the code section printed above **regardless of whether the driver does or does not consent**. Despite having been informed of this code section and understanding that I refuse to comply with the lawful request of a duly licensed law enforcement officer[,] I have chosen to refuse to withdraw the above individual's blood. I understand I may be called to testify in Court to explain why the law enforcement officer was unable to comply with the requirements of TCA 55-10-406(f).[1]

Lieutenant Taylor then contacted Assistant District Attorney General Stacy Edmondson. He said they "attempted to contact Hickman County and Perry County to find out [in] which facility … [they] could serve the warrant." Lieutenant Taylor then transported the Defendant to a medical facility in Perry County, which was approximately twenty miles away and required thirty minutes of travel time. Lieutenant Taylor explained that he wanted to obtain a blood sample as soon as possible because the alcohol level in a person's system typically decreases over time.

---

[1] Tennessee Code Annotated section 55-10-406 was amended, effective July 1, 2014. The statute was reorganized such that section 55-10-406 no longer includes subsection (f). Thus, it appears that the form signed by Mr. Lineberry was outdated.

- 4 -

Upon arriving at the medical facility in Perry County, Lieutenant Taylor was joined by a deputy with the Perry County Sheriff's Department. Lieutenant Taylor met with the nurse who was on duty and provided her with a copy of the search warrant. According to Lieutenant Taylor, the Defendant was still combative and continued to state that "no one is sticking a needle in [him], no one is taking [his] blood." The nurse spoke to the Defendant, but the Defendant refused to submit a blood sample. The Defendant was told that he would be strapped down if he refused to comply. The staff doctor then spoke to the Defendant for approximately five minutes, after which the Defendant complied with the blood draw without being strapped down.

The nurse drew the Defendant's blood at 9:55 p.m. Lieutenant Taylor said more than two and one-half hours elapsed between the time of the stop and the blood draw. He sealed the blood sample and submitted it to the Tennessee Bureau of Investigation (TBI) for testing.

On cross-examination, Lieutenant Taylor stated that Phyllis Whitehead, the magistrate who signed the search warrant, lived just outside the city limits and approximately five minutes from the police department where she signed the search warrant. Lieutenant Taylor described the Defendant as primarily verbally combative. The officer stated that at one point, the Defendant threatened physical harm, stating that "he had head and feet even though he was handcuffed."

Mr. Lineberry was the only person whom Lieutenant Taylor saw working at the Lewis County medical facility that night. Lieutenant Taylor said that while a doctor also worked at the facility, he did not see the doctor that night. Lieutenant Taylor did not request to speak to the doctor or to Mr. Lineberry's supervisor. He acknowledged that those authorized to draw blood included phlebotomists, registered nurses, physician assistants, doctors, and emergency medical technicians (EMTs). He also acknowledged that an EMT was typically on duty in Lewis County at all hours of the day. Lieutenant Taylor stated that the EMTs in Lewis County generally were required to follow the same guidelines as the medical facility where Mr. Lineberry worked. Lieutenant Taylor did not contact an EMT in Lewis County to determine whether he or she would draw the Defendant's blood. He stated that no other healthcare providers in Lewis County were open during that hour. He explained that he transported the Defendant to Perry County because he believed the facility was closer than the facility in Hickman County.

Ms. Leah Watkins, the Director of Nurses at Perry Community Hospital, testified that Ms. Jennifer Tatum Eaves, a registered nurse at the hospital, drew the Defendant's blood. Ms. Eaves passed away prior to the suppression hearing. Ms. Watkins stated that Ms. Eaves was qualified to draw blood throughout the state, including Perry County. Ms. Watkins then stated that Ms. Eaves would have been qualified to draw blood in Lewis

County had she been employed in Lewis County. On cross-examination, Ms. Watkins clarified that to her knowledge, a nurse must be employed in Lewis County to be able to draw blood in the county.

Special Agent Kelly Hopkins, a forensic scientist with the TBI's Toxicology Unit, was accepted by the trial court as an expert in toxicology. Special Agent Hopkins tested the Defendant's blood sample and determined that the level of ethanol or ethyl alcohol in his blood was .205 grams percent. She stated that the results represented the level of ethanol in the Defendant's blood at the time of the blood draw. She also stated that as a result, it is important to draw a suspect's blood as close to the time of the stop as possible.

Special Agent Hopkins testified that if a driver's blood alcohol level was .08 percent at the time of the stop and his blood was not drawn until two and one-half hours later, his blood alcohol level could be higher, lower, or the same as his level at the time of the stop. She noted that once a person reaches complete absorption, the person metabolizes alcohol at a rate of 0.01 to 0.02 grams percent per hour, which roughly equals one drink or one can of beer per hour. She stated that had the Defendant reached complete absorption at the time of the stop, his blood alcohol level would have been .02 to .04 grams percent higher at the time of the stop two and one-half hours earlier. She also stated that the Defendant's blood alcohol level at the time of the stop could have been lower than his level at the time of the blood draw if he had consumed alcohol shortly prior to the stop and had been "on the upside of the alcohol curve" such that his body was still absorbing alcohol. Special Agent Hopkins said she believed that "it is tough for an individual to consume that amount of alcohol that quickly right before the time of the stop."

On cross-examination, Special Agent Hopkins testified that the time necessary to reach complete absorption is dependent upon several factors. She explained that a person who has an empty stomach can reach complete absorption within fifteen to twenty minutes from his or her last drink. She further explained that consumption of food could delay absorption for thirty minutes to two hours after the person's last drink. Other factors that affect alcohol absorption include the type of alcohol consumed, how fast the alcohol was consumed, and the concentration of the alcohol in the drink. Special Agent Hopkins did not receive any information regarding any of these factors or information regarding the Defendant's height and weight in testing the Defendant's blood. Special Agent Hopkins testified that even if complete absorption had been reached, it could be several hours before a blood alcohol concentration of .20 grams percent would completely dissipate from a person's system.

Following arguments by both parties, the trial court made oral findings and granted the Defendant's motion to suppress the evidence obtained as a result of the blood

draw. The trial court found that the Defendant's blood was not seized in Lewis County as required by the search warrant and that Ms. Eaves was not qualified to draw blood in Lewis County because she was not employed there. The trial court noted that the jurisdiction of the magistrate who issued the search warrant was limited to Lewis County and that she did not have jurisdiction to authorize searches in Perry County. The trial court concluded that the blood draw was "unlawful, unconstitutional, and not authorized by this search warrant." The trial court found that no exigent circumstances existed to justify the blood draw.

The trial court subsequently entered a written order granting the Defendant's motion. The trial court first cited to the Fourth Amendment of the United States Constitution and article I, section 7 of the Tennessee Constitution and stated that blood cannot be drawn unless the search is reasonable under the Fourth Amendment. The trial court found that pursuant to Tennessee Rule of Criminal Procedure 41(a), the magistrate who issued the search warrant only had jurisdiction to authorize searches in Lewis County and could not authorize searches in Perry County. The trial court also found that the terms of the search warrant required that the Defendant's blood be seized in Lewis County and be drawn by a nurse who was qualified to draw blood in Lewis County. The trial court found that the Defendant's blood was seized in Perry County and that the nurse who drew the Defendant's blood was not qualified to do so in Lewis County. Thus, the trial court concluded that the search warrant was not properly executed.

The trial court also rejected the State's contention that exigent circumstances justified the blood draw. The trial court noted that the concern of the dissipation of a person's blood alcohol level alone does not constitute exigent circumstances justifying a warrantless blood draw. The trial court also noted that although Mr. Lineberry declined to draw the Defendant's blood, Lieutenant Taylor did not ask to speak to a doctor or Mr. Lineberry's supervisor and did not take the Defendant to anyone else authorized to draw blood in Lewis County, such as an EMT.

The trial court rejected the State's argument that it would have taken too much time to obtain a warrant in Perry County because Lieutenant Taylor would have had to return the Defendant to the Lewis County jail, drive to Perry County to obtain a search warrant from the Perry County magistrate, drive back to Lewis County to retrieve the Defendant, and then transport the Defendant to a medical facility in Perry County. The trial court found that no evidence was presented to explain why Lieutenant Taylor could not have obtained the assistance of another officer to transport the Defendant to the medical facility in Perry County while Lieutenant Taylor obtained the search warrant in Perry County. The trial court also found that Special Agent Hopkins or another expert

would have been able to calculate the Defendant's blood alcohol content even after the passage of time.[2]

Thereafter, the State filed a motion in the trial court requesting permission to seek an interlocutory appeal in this court pursuant to Tennessee Rule of Appellate Procedure 9. The trial court granted the State's motion, and this court subsequently granted the State's application for permission to appeal the trial court's order granting the Defendant's motion to suppress.

## ANALYSIS

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

### A. Search Warrant

The State asserts that the issuance and the execution of the search warrant were proper and that the trial court erred in concluding otherwise. According to the State, the Defendant did not challenge the blood draw in the trial court on constitutional grounds, and the trial court's order was "somewhat unclear on this point." The State argues that, nevertheless, the issuance of the search warrant was constitutional. The State further argues that the issuance and execution of the search warrant did not violate Tennessee Rule of Criminal Procedure 41 or Tennessee Code Annotated sections 40-6-101—108.

The Defendant concedes that the issuance of the search warrant complied with constitutional and statutory law. Rather, he maintains that the execution of the search warrant was unconstitutional because the police officer's actions exceeded the scope and authority of the search warrant. The Defendant further maintains that the constitutionality of the execution of the search warrant was litigated in the trial court.

---

[2] The trial court rejected the Defendant's argument that the search was invalid because the officer failed to complete the return in accordance of Tennessee Rule of Criminal Procedure 41(f)(1). This issue, however, is not raised on appeal.

Although inartfully pled, the Defendant cited to the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution in his motion to suppress and challenged the execution of the search warrant. In its oral findings, the trial court specifically found that the blood draw was unconstitutional. The trial court also discussed the application of the Fourth Amendment to blood draws in its written order before finding that the search warrant was not properly executed. Accordingly, we conclude that the issue of the constitutionality of the execution of the search warrant is properly before this court.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Amendment applies to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Article I, section 7 of the Tennessee Constitution guarantees that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." Tenn. Const. art. I, § 7. Our supreme court has recognized that article I, section 7 "is identical in intent and purpose with the Fourth Amendment." *State v. Reynolds*, 504 S.W.3d 283, 303 (Tenn. 2016) (citations omitted). The taking of a blood sample constitutes a "search" that is afforded protection under the Fourth Amendment and article I, section 7. *See Birchfield v. North Dakota*, 136 S.Ct. 2160, 2173 (2016); *Reynolds*, 504 S.W.3d at 304.

Although the Fourth Amendment and article I, section 7 do not "specify when a warrant must be obtained, the general rule is that a warrant ordinarily should be obtained because warrants are the safeguard against unreasonable searches." *Reynolds*, 504 S.W.3d at 304 (citing *Kentucky v. King*, 563 U.S. 452 (2001); *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008)). The Defendant does not challenge the issuance of the search warrant allowing the officer to obtain a blood sample. Rather, he challenges the officer's execution of the search warrant.

"The general touchstone of reasonableness which governs Fourth Amendment analysis … governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *see State v. Tommy Kaye Thompson*, No. M2014-00596-CCA-R3-CD, 2015 WL 1756448, at *6 (Tenn. Crim. App. Apr. 15, 2015). The United States Supreme Court has recognized that "the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394-95 n. 7 (1971); *see Dalia v. United States*, 441 U.S. 238, 260 (1979). The language of the search warrant must be strictly construed. *United States v. Wright*, 468 F.2d 1184, 1185 (6th Cir. 1972)

(citation omitted); *see State v. Bob Wilson*, No. 153, 1988 WL 42652, at \*2 (Tenn. Crim. App. May 4, 1988).

The search warrant authorizing the blood draw commanded the officer to "take custody of the suspect and transport the suspect to a person qualified to draw blood in Lewis County, Tennessee," and to "search for, seize and maintain as evidence the property described in said Affidavit, to-wit:  human blood from the body of the [Defendant]."  In granting the Defendant's motion to suppress, the trial court analyzed this language as requiring that the blood draw occur in Lewis County and that the person who was to draw the Defendant's blood be qualified to do so in Lewis County.  The jurisdiction of the magistrate who signed the search warrant was limited to Lewis County, and she did not have the authority to issue a search warrant for a search outside of Lewis County.  *See* Tenn. R. Crim. P. 41(a) ("A magistrate with jurisdiction in the county where the property sought is located may issue a search warrant authorized by this rule.").[3] Given this jurisdictional limitation, the search warrant can be fairly interpreted as requiring that the blood draw take place in Lewis County.  Regardless, the proof presented at the suppression hearing established that the officer transported the Defendant to Perry County, where the blood draw occurred, and that the nurse who drew the Defendant's blood was not qualified to draw blood in Lewis County.  Thus, the condition was not met regardless of whether the warrant required that the blood draw occur in Lewis County or that the person who drew the blood be qualified to do so in Lewis County.  Accordingly, we must determine whether the officer's failure to abide by the requirements of the search warrant during its execution rendered the blood draw unconstitutional.

In *Jones v. Kirchner*, 835 F.3d 74, 84-85 (D.C. Cir. 2016), the arrestee brought a civil action against law enforcement officers, alleging in part that the officers violated his Fourth Amendment rights by executing a search warrant at his residence at 4:45 a.m. when the search warrant expressly stated that the search was not to occur before 6:00 a.m.  In the arrestee's appeal of the trial court's dismissal of his claims, the arrestee argued that the search was unlawful because it violated an express limitation on the face of the search warrant.  *Id.* at 84.  In analyzing the issue, the United States Court of Appeals for the District of Columbia recognized that "[u]nlike rules of criminal procedure and other sub-constitutional bodies of law, violations of which may be unlawful but are not necessarily unconstitutional, … compliance with the limitations of a warrant is required by the Constitution itself."  *Id.* at 84-85 (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *Bivens*, 403 U.S. at 394-95 n.7).  The court concluded that by

---

[3] We note that the search warrant complied with Tennessee Rule of Criminal Procedure 41(a) at the time of the issuance because the Defendant was located in Lewis County when the magistrate issued the search warrant.

executing the search warrant during a time period outside of the period mandated by the warrant, the officers exceeded the authorization provided in the search warrant and, therefore, violated the Fourth Amendment. *Id.* at 85.

The court recognized that the warrant requirement "'provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime.'" *Id.* at 85-86 (quoting *United States v. Leon*, 468 U.S. 897, 913-14 (1984)). The court noted that if the officers believed that the limitation on the search warrant was improvident or merely a drafting error, the officers had other options, such as contacting the magistrate to authorize nighttime execution. *Id.* at 86. The court concluded that "[s]imply ignoring the timing limitation was not among the choices lawfully available to the officers in this case." *Id.* The court, nevertheless, determined that the officers were entitled to qualified immunity on different grounds. *Id.*

The Fourth Amendment and article I, section 7 do not require the limitations that were included in the search warrant in the present case. Nevertheless, once the magistrate included the conditions in the search warrant, the execution of the search warrant within those limitations was constitutionally required. *See Bivens*, 403 U.S. at 394-95 n.7; *Jones*, 835 F.3d at 84-85.

Once Mr. Lineberry declined to draw the Defendant's blood, the officer had multiple avenues in which to proceed. The officer could have contacted the magistrate about the limitations, requested assistance from Mr. Lineberry's supervisor or the doctor on duty at the medical facility in Lewis County, requested a Lewis County EMT draw the Defendant's blood, or obtained a search warrant in Perry County. Instead, after contacting an assistant district attorney, who has no authority under the law to choose to ignore the limitations of a search warrant, the officer chose to disregard the limitations included in the search warrant by the magistrate. In doing so, the officer exceeded the authorization provided in the search warrant, rendering the execution of the search warrant unconstitutional. *See Jones*, 835 F.3d at 85.

This court has previously held that an officer's alteration of a search warrant changing the route to the premises to be searched prior to the execution of the warrant rendered the search warrant void. *See Bob Wilson*, 1988 WL 42652, at *2. While describing the alteration as "minimal," this court reasoned that

> to condone an alteration of a search warrant by a law enforcement officer in these circumstances would open the door to other alterations in other circumstances. This would require trial courts and the appellate courts to begin drawing distinctions between "significant" alterations by officers and

"insignificant" or "minimal" alterations. Given the history of strict construction of search warrants by the courts of this state, and the great power vested in officers armed with a search warrant, there is no reason to embark on a ride down that slippery slope.

*Id.*

Although the present case involves the officer's failure to abide by the terms of the search warrant, we believe that the reasoning in *Bob Wilson* also applies to the present case. To condone the failure to abide by the limitations included in the search warrant in this case would open the door to officers' failing to abide by conditions in search warrants in other cases. It also would require courts to distinguish between the failure to abide by significant limitations and insignificant limitations. We, like this court in *Bob Wilson*, see "no reason to embark on a ride down that slippery slope." *Id.* Rather, we conclude that the officer's failure to abide by the terms of the search warrant during its execution rendered the blood draw unconstitutional.

## B. Exigent Circumstances

The State contends that the blood draw was proper under the exigent circumstances exception to the warrant requirement. The Defendant responds that the trial court correctly found that there were no exigent circumstances supporting the blood draw. We agree with the Defendant.

Exigent circumstances dispense with the warrant requirement when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). In determining whether this exception applies, "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *State v. Meeks*, 262 S.W.3d 719, 723 (Tenn. 2008) (footnote omitted). Mere speculation, however, is insufficient to establish exigency. *Id.* at 723-24. Rather, "the State must rely upon specific and articulable facts and the reasonable inferences drawn from them." *Id.* at 724 (footnotes omitted). We must examine the totality of the circumstances in determining whether there were exigent circumstances that justified acting without a warrant. *Missouri v. McNeely*, 133 S.Ct. 1552, 1559 (2013). "The circumstances are viewed by an objective perspective," and the officer's subjective intent is irrelevant. *Meeks*, 262 S.W.3d at 724.

Circumstances that give rise to an exigency sufficient to justify a warrantless search include the prevention of "the imminent destruction of evidence." *Id.* at 723 (citation omitted). The United States Supreme Court has recognized that "the percentage

of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Schmerber v. California*, 384 U.S. 757, 770 (1966); *see McNeely*, 133 S.Ct. at 1560. However, although the natural dissipation of alcohol from the blood may be a factor in determining exigency, it does not create a per se exigency sufficient to dispense with the warrant requirement. *McNeely*, 133 S.Ct. at 1563. In rejecting the per se exigency rule, the Supreme Court concluded, "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 1561 (citing *McDonald*, 335 U.S. at 456). The Court stated that "no plausible justification for an exception to the warrant requirement" would exist when the warrant process would not "significantly increase the delay before the blood test … because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer." *Id.* Accordingly, the "exigency … must be determined case by case based on the totality of the circumstances." *Id.* at 1556.

The State maintains that "[t]he circumstances of this case, where [Lieutenant] Taylor properly obtained a warrant and only moved to a different county because of a recalcitrant nurse, support a finding that exigent circumstances justified a warrantless blood draw." We disagree with the State's characterization of Mr. Lineberry as "recalcitrant." While Tennessee Code Annotated section 55-10-406 lists those who are authorized to draw the blood of someone accused of a drunken driving related offense, neither this statute nor any other Tennessee statute compels medical personnel to forcibly draw a suspect's blood whenever requested by an officer to do so. It has been recognized that multiple ethical and safety concerns arise from a forcible blood draw by medical personnel. *See, e.g.* Jacob M. Appel, *Nonconsensual Blood Draws and Dual Loyalty: When Bodily Integrity Conflicts with the Public Health*, 17 J. Health Care L. & Pol'y 129, 149-54 (2014); E. John Wherry, Jr., *DWI Blood Alcohol Testing: Responding to a Proposal Compelling Medical Personnel to Withdraw Blood*, 18 Seton Hall Legis. J. 655, 657, 670-71 (1994). Moveover, medical personnel should not be threatened, coerced, or intimidated into delay treating a sick or injured patient in order to forcibly draw the blood from a suspected drunk driver, who is uninjured and was not involved in an accident, for the sole purpose of assisting the officer in securing evidence. Given the safety and ethical concerns and the primary purpose of medical facilities to treat those who are sick and injured, a policy by a medical facility to decline to engage in forcible blood draws is reasonable. Contrary to the State's characterization of Mr. Lineberry as "recalcitrant," the evidence established that Mr. Lineberry was simply doing his job and complying with the medical facility's policy.

Lieutenant Taylor did not contact the Lewis County medical facility before attempting to execute the search warrant. There is nothing in the record explaining the

officer's failure to do so.  Had the officer done so, he would have learned of the policy sooner and made other arrangements.

Instead, the officer transported the Defendant to the medical facility, while possessing an order from the magistrate threatening anyone who refused to draw the Defendant's blood with contempt.  Because Tennessee law does not compel a medical provider, a private citizen, to forcibly draw a suspect's blood whenever requested by an officer for the sole purpose of securing evidence and not for the purpose of diagnosis and treatment, the magistrate's order was likewise invalid and appalling.[4]  Once Mr. Lineberry declined to draw the Defendant's blood, the officer took the time to have Mr. Lineberry sign a form that appeared to fault Mr. Lineberry for declining to forcibly draw the Defendant's blood even through it was well within Mr. Lineberry's right to decline to conduct the blood draw.

Lieutenant Taylor did not attempt to locate anyone else in Lewis County qualified to draw blood, even though he acknowledged that an EMT was on duty at all times.  While the Lieutenant Taylor believed that the EMT may have been subject to the medical facility's policy to decline to conduct forcible blood draws, the officer never verified this information, and the State never presented any proof during the suppression hearing to establish that an EMT was unavailable.

Once Lieutenant Taylor decided to ignore the requirements of the lawfully obtained search warrant and transport the Defendant to Perry County for the blood draw, he failed to obtain a search warrant in Perry County.  Lieutenant Taylor testified that he would have had to return the Defendant to the Lewis County jail, obtain the search warrant in Perry County, return to the Lewis County jail to retrieve the Defendant, and then drive to the medical facility in Perry County.  However, the State failed to present any evidence during the suppression hearing to establish that another officer was unavailable to assist Lieutenant Taylor in either securing a search warrant in Perry County or remaining with the Defendant at the Perry County medical facility while Lieutenant Taylor secured a search warrant.  To the contrary, a Perry County officer was present at the medical facility during the blood draw and could have assisted Lieutenant Taylor in securing a search warrant.

Finally, according to Special Agent Hopkins' testimony, a person must reach complete absorption before alcohol begins to metabolize.  She acknowledged that the level of alcohol in the Defendant's blood could have been increasing or decreasing at the

---

[4] The legal profession holds those in the medical profession to be in the highest regard due to its respect and admiration for those medical professionals.  Treating a nurse like an indentured servant and requiring the nurse, under the threat of jail, to ignore his or her professional duties and assist an officer in the investigation of his case on demand is the reason that this court finds the magistrate's order appalling.

time of the stop depending upon when the Defendant last consumed alcohol. We note that prior to the stop, the Defendant was reportedly seen throwing beer cans out of his vehicle's window. Thus, there is some evidence suggesting that the Defendant was consuming alcohol shortly before he was stopped, which would have resulted in his alcohol level increasing, delayed complete absorption, and reduced the risk that the alcohol in the Defendant's blood would greatly dissipate before the officer could obtain a search warrant in Perry County.

We conclude that based on the totality of the circumstances, the State failed to establish exigent circumstances justifying the blood draw without a valid search warrant. Accordingly, the State is not entitled to relief regarding this issue.

### C. Good Faith Exception

The State maintains that the evidence resulting from the blood draw is nevertheless admissible pursuant to the Exclusionary Reform Act in Tennessee Code Annotated section 40-6-108 and the good faith exception recognized in *State v. Davidson*, 509 S.W.3d 156 (Tenn. 2016). Although *Davidson* was not decided until after the suppression hearing, section 40-6-108 was enacted in 2011, several years prior to the Defendant's blood draw and the suppression hearing. The State, however, failed to raise the application of 40-6-108 or the good faith exception in general in the trial court. Regardless, the State is not entitled to relief.

Section 40-6-108 does not apply to evidence seized in violation of the United States Constitution or Tennessee Constitution. T.C.A. § 40-6-108(a). In *Davidson*, the Tennessee Supreme Court adopted

> a good-faith exception for the admission of evidence when a law enforcement officer has reasonably and in good faith conducted a search within the scope of a warrant the officer believes to be valid, but is later determined to be invalid solely because of a good-faith failure to comply with the affidavit requirement of Tennessee Code Annotated section 40-6-103 and -104 and Tennessee Rule of Criminal Procedure 41(c)(1).

509 S.W.3d at 185-86. In the present case, we have concluded that the execution of the search warrant was unconstitutional. Because our holding is based on a violation of the United States and Tennessee Constitutions, section 40-6-108 and *Davidson* do not apply.

**CONCLUSION**

We affirm the trial court's suppression of evidence resulting from the Defendant's blood draw. We remand the case to the trial court for further proceedings consistent with this opinion.

_____
JOHN EVERETT WILLIAMS, JUDGE